**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

|  |  |
|---|---|
| **FIRECLEAN LLC,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 1:16-cv-00294 (JCC/MSN)** |
| **ANDREW TUOHY** | |
| and | |
| **EVERETT BAKER,** | |
| **Defendants.** | |

**DEFENDANT ANDREW TUOHY'S MEMORANDUM OF LAW
<u>IN SUPPORT OF HIS MOTION TO DISMISS THE COMPLAINT</u>**

Jay Ward Brown, Va. Bar No. 34355
LEVINE SULLIVAN KOCH & SCHULZ, LLP
1899 L Street, N.W., Suite 200
Washington, DC  20036
Telephone:  (202) 508-1100
Facsimile:  (202) 861-9888
jbrown@lskslaw.com


*Counsel for Defendant Andrew Tuohy*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS ...................................................................................................2

I.      THE PARTIES............................................................................................................2

I.      TUOHY'S REPORTING ON FIRECLEAN.....................................................................2

        A.      The September 12 Article ................................................................................3

        B.      The September 14 Article ................................................................................6

        C.      The October 23 Article ....................................................................................7

        D.      The January 18, 2016 Facebook Post ..............................................................10

ARGUMENT….......................................................................................................................11

I.      THIS COURT LACKS PERSONAL JURISDICTION OVER TUOHY ........................11

        A.      Tuohy Is Not Subject To General Jurisdiction ...............................................12

        B.      Tuohy Is Not Subject to Specific Jurisdiction ...............................................12

II.     FIRECLEAN'S DEFAMATION CLAIMS FAIL AS A MATTER OF LAW ................18

        A.      Most of the Challenged Statements Do Not Reasonably Convey The
                Defamatory Meaning Alleged And/Or Constitute Non-Actionable
                Opinion .............................................................................................................19

                1.      The "vegetable oil" statements ..............................................................23

                2.      The "Lies, Errors and Omissions" statements ......................................26

        B.      FireClean Has Failed To Plausibly Plead Actual Malice.................................27

III.    PLAINTIFF'S CONSPIRACY CLAIMS FAIL AS A MATTER OF LAW ...................29

CONCLUSION….....................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AdvanFort Co. v. Maritime Executive, LLC*,
   No. 1:15-cv-220, 2015 WL 4603090 (E.D. Va. July 28, 2015)............................................28

*ALS Scan, Inc. v. Digital Service Consultants, Inc.*,
   293 F.3d 707 (4th Cir. 2002) ..........................................................................................13, 17

*Arthur v. Offit*,
   No. 1:09-cv-1398, 2010 WL 883745 (E.D. Va. Mar. 10, 2010)............................................22

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..............................................................................................................28

*Barry v. Whalen*,
   796 F. Supp. 885 (E.D. Va. 1992) ........................................................................................15

*Bay Tobacco, LLC v. Bell Quality Tobacco Prods., LLC*,
   261 F. Supp. 2d 483 (E.D. Va. 2003) ...................................................................................30

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)..............................................................................................................28

*Biospherics, Inc. v. Forbes, Inc.*,
   151 F.3d 180 (4th Cir. 1998) ..........................................................................................20, 21

*Biro v. Condé Nast*,
   807 F.3d 541 (2d Cir. 2015), *cert. denied* 2016 WL 880826 (May 16, 2016) .......................29

*Bochan v. LaFontaine*,
   68 F. Supp. 2d 692 (E.D. Va. 1999) .....................................................................................17

*Calder v. Jones*,
   465 U.S. 783 (1984)..............................................................................................................15

*Chapin v. Knight-Ridder, Inc.*,
   993 F.2d 1087 (4th Cir. 1993) ..............................................................................................19

*Chaves v. Johnson*,
   230 Va. 112 (1985) ...............................................................................................................21

*Consulting Eng'rs Corp. v. Geometric Ltd.*,
   561 F.3d 273 (4th Cir. 2009) ................................................................................................16

*Couloute v. Ryncarz,*
  No. 11-CV-5986-HB, 2012 WL 541089 (S.D.N.Y. Feb. 17, 2012).........................................22

*Cutaia v. Radius Eng'g Intn'l, Inc.,*
  No. 5:11-cv-00077, 2012 WL 525471 (W.D. Va. Feb. 16, 2012)....................................21, 23

*Daimler AG v. Bauman,*
  134 S. Ct. 746 (2014)............................................................................................................12

*Falwell v. Cohn,*
  No. CIV.A.6:02-CV-40, 2003 WL 751130 (W.D. Va. Mar. 4, 2003).............................15, 16

*Felming v. Moore,*
  221 Va. 884 (1981) ...............................................................................................................24

*FireClean LLC v. Fennell,*
  No. 1:16-cv-00293-TSE-JFA (E.D. Va.) ................................................................................4

*Fitzgerald v. Penthouse Int'l, Ltd.,*
  691 F.2d 666 (4th Cir. 1982) ................................................................................................27

*Fuste v. Riverside Healthcare Ass'n, Inc.,*
  265 Va. 127 (2003) ...............................................................................................................20

*Gertz v. Robert Welch Inc.,*
  418 U.S. 323 (1974)..............................................................................................................20

*Goodyear Dunlop Tires Operations, S.A. v. Brown,*
  564 U.S. 915 (2011)..............................................................................................................12

*Hare v. Richie,*
  No. CIV.ELH-11-3488, 2012 WL 3773116 (D. Md. Aug. 29, 2012) ....................................17

*Int'l Shoe Co. v. Washington,*
  326 U.S. 310 (1945)..............................................................................................................12

*Jackson v. Ocwen Loan Servicing, LLC,*
  No. 3:15-cv-238, 2016 WL 1337263 (E.D. Va. Mar. 31, 2016)............................................20

*Jeandron v. Board of Regents of Univ. Sys. Of Md.,*
  510 Fed. App'x 223 (4th Cir. 2013) ........................................................................................2

*Jordan v. Kollman,*
  269 Va. 569 (2005) ..........................................................................................................18, 27

*Katyle v. Penn Nat. Gaming, Inc.,*
  637 F.3d 462 (4th Cir. 2011) ..................................................................................................2

*KMLLC Media, LLC v. Telemetry, Inc.*,
No. 1:15cv432 JCC/JFA, 2015 WL 6506308 (E.D. Va. Oct. 27, 2015) ........................ *passim*

*Knight v. Doe*,
No. 1:10-cv-887, 2011 WL 2471543 (E.D. Va. June 21, 2011) ..............................................16

*Mayfield v. NASCAR*,
674 F.3d 369 (4th Cir. 2012) ................................................................................................29

*Michel v. NYP Holdings, Inc.*,
No. 15-11453, 2016 WL 860647 (11th Cir. Mar. 7, 2016).....................................................29

*Mirafuentes v. Estevez*,
No. 1:15-cv-610, 2015 WL 8177935 (E.D. Va. Nov. 30, 2015) ......................................21, 25

*Moldea v. New York Times Co.*,
15 F.3d 1137 (D.C. Cir. 1994) ..............................................................................................21

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964)...............................................................................................................28

*Nat'l Corp. Hous., Inc. v. Ayers*,
No. 1:11-cv-1391 AJT-TCB, 2012 WL 1081170 (E.D. Va. Mar. 28, 2012)..........................18

*Nathan v. Takeda Pharm. Am. Inc.*,
83 Va. Cir. 216, 2011 WL 8947650 (Va. Cir. Ct. Aug. 2, 2011) ...........................................17

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
591 F.3d 250 (4th Cir. 2009) ................................................................................................19

*New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*,
416 F.3d 290 (4th Cir. 2005) ................................................................................................11

*Newbold Corp. v. Data Sys. Co.*,
No. CIV.A. 706-CV-33, 2006 WL 467979 (W.D. Va. Feb. 28, 2006) ...................................17

*PBM Products, LLC v. Mead Johnson Nutrition Co.*,
678 F. Supp. 2d 390 (E.D. Va. 2009) ...................................................................................20

*Pippen v. NBCUniversal Media, LLC*,
734 F.3d 610 (7th Cir. 2013) ................................................................................................29

*Reuber v. Food Chem. News, Inc.*,
925 F.2d 703 (4th Cir. 1991) ................................................................................................27

*Schaecher v. Bouffault*,
290 Va. 83 (2015) ............................................................................................................18, 19

*Schatz v. Republican State Leadership Comm.*,
   669 F.3d 50 (1st Cir. 2012) ..................................................................29

*Seaton v. TripAdvisor LLC*,
   728 F.3d 592 (6th Cir. 2013) ................................................................22

*Spencer v. American Int'l Grp., Inc.*,
   No. 3:08-CV-591, 2009 WL 47111 (E.D. Va. Jan. 6, 2009) ..................30

*St. Amant v. Thompson*,
   390 U.S. 727 (1968) .............................................................................28

*Walden v. Fiore*,
   134 S. Ct. 1115 (2014) ..........................................................13, 14, 15, 18

*Webb v. Virginian-Pilot Media Companies, LLC*,
   287 Va. 84 (2014) .................................................................................20

*Xtreme 4X4 Ctr., Inc. v. Howrey*,
   65 Va. Cir. 469, 2004 WL 2709602 (Va. Cir. Ct. Sept. 13, 2004) .........22

*Yeagle v. Collegiate Times*,
   255 Va. 293 (1998) ...............................................................................19

*Young v. New Haven Advocate*,
   315 F.3d 256 (4th Cir. 2002) ..................................................13, 14, 17

## Other Authorities

FED. R. CIV. P. 12(b)(2) ..........................................................................11

FED. R. CIV. P. 12(b)(6) ........................................................................2, 30

47 U.S.C. § 230 .....................................................................................19

## PRELIMINARY STATEMENT

This lawsuit is a classic example of a business using litigation to suppress negative consumer reports.  At the same time, it ultimately boils down to a scientific dispute over what testing is adequate to declare two substances chemically "similar."  It is a dispute appropriately "tried" in the courts of public and scientific opinion, but not in this Court.

For seven years, defendant Andrew Tuohy, a former petty officer in the Navy who lives in Arizona, has published a blog regarding firearms and related products and issues.  Titled the Vuurwapen Blog ("Vuurwapen" means "firearm" in Dutch), Tuohy offers advice and opinions on an industry often awash in misinformation, aiming to give consumers, including his military cohorts, an assessment of products upon which lives sometimes depend.  In early 2015, reports began circulating in the firearms community that the gun oil FIREClean distributed by plaintiff FireClean LLC ("FireClean"), a high-end product marketed as "new and different," was composed of common vegetable oil.  In response to this public controversy within the firearms community, Tuohy arranged for volunteer scientific experts to test the chemical properties of FIREClean and then—after soliciting input from FireClean—published articles reporting the results of the experts' analysis: that FIREClean exhibited chemical properties similar to unsaturated vegetable oil.  In classic fashion, FireClean filed this suit alleging that Tuohy and his co-defendant, Everett Baker (a chemistry student at Worcester Polytechnic Institute who assisted with the testing), had conspired to defame FireClean.

The first problem with FireClean's suit is that this Court lacks personal jurisdiction over Tuohy.  But even if this Court were for some reason to hold otherwise, FireClean's claims fail on their merits as a matter of law for multiple reasons, as set forth below.

## STATEMENT OF FACTS

### I.      THE PARTIES

Plaintiff FireClean LLC is a Virginia-based company that has sold and distributed a gun

oil called FIREClean since 2012.  Compl. ¶¶ 1, 24.[1]

Tuohy, an Arizona resident and former Naval petty officer, maintains and publishes the

Vuurwapen Blog, www.vuurwapenblog.com,  as well as a related Facebook page and a YouTube

video channel.  Compl. at 2 & ¶¶ 2, 33; Declaration of Andrew Tuohy ("Tuohy Decl.")  ¶ 6.  The

Vuurwapen Blog focuses on firearms and related products and issues.  Its primary audience is

gun owners, gun retailers, members of the military, and gun aficionados.  *Id.*

Co-defendant Everett Baker, a New Hampshire resident, is a student at the Worcester

Polytechnic Institute who publishes his own blog, Granite State Guns.  Compl. ¶¶ 3, 17, 101.

### II.     TUOHY'S REPORTING ON FIRECLEAN

FIREClean is a relatively new gun oil, introduced to the market in 2012.  *Id.* at 1.  It is

advertised by FireClean as a "new and different approach to operating your firearm."  *See*

www.cleanergun.com (last visited 5/16/16).[2]  It purportedly is an "odorless" and "non-toxic"

product that "cleans," "repels carbon," and "lubricates" gun parts and is "designed to hold as an

oil to the highest possible temperatures, and provide the best possible lubricity across the

applicable temperature spectrum."  *Id.*

---

[1] As required for purposes of this motion to dismiss, Tuohy treats the well-pleaded factual
allegations contained in the Complaint as true.

[2] When adjudicating a Rule 12(b)(6) motion, the Court may consider the Complaint and its
exhibits, documents incorporated into the Complaint by reference, and "facts . . . 'capable of
accurate and ready determination by resort to sources whose accuracy cannot reasonably be
questioned,' and thus properly subject to judicial notice."  *Katyle v. Penn Nat. Gaming, Inc.*, 637
F.3d 462, 466 (4th Cir. 2011).  This includes the content of FireClean's own website.  *See
Jeandron v. Board of Regents of Univ. Sys. Of Md.*, 510 Fed. App'x 223, 227 (4th Cir. 2013).

Tuohy first began examining FIREClean's effectiveness in 2012, when FireClean sent him a sample of it and solicited him to write a review of the product.  Compl. ¶ 57; Tuohy Decl. ¶ 8.  As FireClean points out, Tuohy conducted various tests of the product by using it on different firearms, and later decided to write about his experiences firing a gun lubricated with the oil that had been stored for two years in order "'to address concerns [expressed within the firearms community] over whether or not FIREClean causes the action to gum up over time.'"  Compl. ¶ 57 (quoting Tuohy).  Tuohy reported to the public that the product performed well.  *Id.*  Not surprisingly, FireClean takes no issue with this favorable report by Tuohy, although it challenges as false and defamatory virtually everything Tuohy has subsequently written.

### A.     The September 12 Article

At approximately the same time Tuohy was preparing his favorable report on FIREClean's *performance*, commentary began circulating within the firearms community regarding FIREClean's *composition*—specifically, that the high-priced FIREClean was no more than inexpensive, household vegetable oil (sometimes referred to by those commentators by the brand name "Crisco").  *See* Compl. ¶ 66 & Ex. C.  Many bloggers and other writers weighed in on the validity of these allegations.  For example, a video posted to Youtube.com purported to show that FireClean and Crisco brand vegetable oil have the same smoke point, a very basic indicator that two substances may share similar chemical properties.  *See id.* Ex. C.

Significantly, as FireClean grudgingly acknowledges in its Complaint, this public controversy regarding the composition of FIREClean appears to have been started by George Fennell, the head of a company named Steel Shield Technologies, Inc., which markets a competing gun lubricant called WeaponShield.  *Id.* ¶ 66.  Indeed, FireClean has filed a separate defamation action against Fennell and Steel Shield in this Court, alleging that his public statements—the vast majority of which were published prior to the statements by Tuohy at issue

3

here—defamed FireClean and constitute false advertising.  *See* Complaint in *FireClean LLC v. Fennell*, No. 1:16-cv-00293-TSE-JFA (E.D. Va.) (Dkt. No. 2) ("Steel Shield Complaint") at ¶¶ 45, 47, 112 & Ex. Q.  More specifically, mainly during the period June-August 2015, Fennell apparently made numerous public statements on Facebook and YouTube critical of FIREClean, declaring, for example, on WeaponShield's YouTube channel that he had tested the product and "'can see NO difference in basic composition and performance'" between Crisco and FIREClean.  *Id.* ¶ 71; *see also, e.g., id.* ¶ 112 (alleging that Fennell published on Facebook that he had "'spectra-analyzed [FIREClean] to be certain of its identity (Vegetable oil), then I went and looked up the patent # (phony) they use…its for vegetable oil…why pay them $13.99 for 2 ounces?  Buy a big bottle of Crisco oil and save big time").

It was in this context that Tuohy undertook to address the *composition* (and pricing) of FIREClean in a post to his blog on September 12, 2015, titled "Infrared Spectroscopy of FireClean and Crisco Oils" (the "September 12 Article"), Compl. Ex. C, which contains the first of the statements challenged by FireClean in this lawsuit.  Indeed, Tuohy expressly sets out at the beginning of the article the substance of the on-going public controversy over the composition of FIREClean, including the allegations by others claiming to have scientific evidence that FIREClean is "Crisco."  *See id.* at 1-2.  The text of the September 12 article speaks for itself and the Court therefore need not accept either party's characterization of it, but several points bear emphasis:

First, as part of his reporting on the controversy surrounding FIREClean's composition, on August 29, 2015, Tuohy contacted Ed Sugg, one of the owners of FireClean, and solicited his response.  *Id.* ¶ 34.  Sugg denied that FireClean is Crisco, a denial Tuohy duly included in the article.  *Id.* ¶ 35 & Ex. C at 1 ("I spoke at length with one of the makers of FireClean, Ed Sugg,

4

and he assured me that not a single drop of Crisco has ever been part of their formulation, even during initial testing with various mixtures."). Tuohy also contacted Fennell and asked him to substantiate his claims about FIREClean. *Id.* Ex. C at 1-2. However, Tuohy reported to his readers, Fennell refused to provide any scientific evidence and then "sent a very long and agitated message again refusing to supply the test before blocking me on Facebook." *Id.* at 2.

Second, Tuohy obtained an independent evaluation of the chemical properties of FIREClean from a chemistry professor at the University of Arizona. *See id.* ¶ 39 & Ex. C at 2; Tuohy Decl. ¶ 9. The professor performed a test known as an infrared spectroscopy analysis, comparing the chemical composition of FireClean, Crisco brand vegetable oil, and Crisco brand canola oil. *Id.* Tuohy shared the results of the test with FireClean and unsuccessfully sought comment as to FIREClean's composition. *See* Compl. Ex. C at 4; Tuohy Decl. ¶ 10. In the September 12 Article, Tuohy describes the method used at the University of Arizona to analyze FireClean and reproduces the test results for the three substances, which in the opinion of the chemistry professor, bear marked similarities. Compl. ¶ 39 & Ex. C at 3. Based on these test results, Tuohy published the professor's view that "FireClean is probably a modern unsaturated vegetable oil virtually the same as many oils used for cooking." Compl. ¶ 40 & Ex. C at 3. However, Tuohy also emphasized, "I did not – and still do not – believe that FireClean is Crisco." Compl. Ex. C at 1.

Finally, in the September 12 Article, Tuohy also addressed the issue of corrosion protection, another topic of critical concern to gun users. Tuohy noted that "FireClean wasn't advertised as protecting against corrosion," and that this seemed to be confirmed by the chemical tests. Compl. Ex. C at 3-4. Tuohy quoted the professor at the University of Arizona:

> "I don't see any sign of other additives such as antioxidants or corrosion inhibitors. Since the unsaturation in these oils, especially

> linoleate residues, can lead to their oligomerization with exposure to
> oxygen and light, use on weapons could lead to formation of solid
> residues (gum) with time.  The more UV and oxygen, the more the oil
> will degrade."

*Id.* ¶ 50 & Ex. C at 3-4.  Based on this information, Tuohy opined that FIREClean is not suitable

for military use:  "Given that people in the military are often exposed to both UV and oxygen

(such as when they go outdoors) and also need corrosion protection for their firearms, I would

not recommend FireClean be used by members of the military*."  Id.* ¶ 51 & Ex. C at 4.

Readers of the Vuurwapen Blog posted comments about the article.  *Id.* ¶ 64.  In response

to one comment on Facebook, Tuohy responded, "I don't think it's Crisco.  But I do think the

formulation is a lot less whiz-bang than it's been made out to be.  More power for them for

having been able to sell something at 100x markup for three years, but they had to know the

gravy train would come off the rails at some point.  I admire their gusto for having done it and

part of me wonders if I could look people in the eye and tell them they needed to spend $7.50 an

ounce on some sort of cooking oil for their gun.  I don't think I could."  Compl. ¶ 122 & Ex. M.

At least as Tuohy understands the repetitive allegations of the Complaint, FireClean

complains that the September 12 Article is false and defamatory insofar as it states or implies that

(1) FIREClean is similar to common cooking oil, (2) FireClean has "lied" about the composition

of its product, and (3) FIREClean is not fit for its intended purpose and/or is unsuitable for

military use.  Compl. ¶¶ 148, 150.

### B.     The September 14 Article

Shortly after publishing the September 12 Article, Tuohy became aware of a video

produced by Vickers Tactical and published on Youtube.com.  Compl. ¶ 74 &. Ex. E.  The video,

titled "FireClean Lube Test," purported to show that FireClean is effective at preventing carbon

buildup in firearms, as indicated by the amount of smoke generated during firing.  *Id.* ¶ 76 & Ex.

E.  It contains an interview with Ed and Dave Sugg, the developers of FIREClean, as well as a series of test firings with weapons that have been alternately treated with no lubricant, a military-grade lubricant, and finally with FIREClean.  *Id.* ¶¶ 75, 77.

Tuohy wrote an article about the video, published to the Vuurwapen Blog on September 14, 2015 (the "September 14 Article").  *Id.* Ex. E.  This article, too, speaks for itself, but, once again, certain points bear emphasis.  The thrust of the September 14 Article is Touhy's expression of belief, based on his review of the video, that the test was likely unreliable because different ammunition had been used in the different test firings, making accurate comparison of the lubricants impossible.  *Id.* ¶ 78 &. Ex. E.  In the article, Tuohy examined the video frame by frame, linked to the full video so that his readers could view it for themselves, and provided illustrative screenshots to support each of his conclusions.  The screenshots showed that the "headstamps," which identify the provenance of the ammunition, varied from test to test.  *Id.*  Tuohy expresses, in strong language, the view that this calls into question the credibility of FireClean and its principals.  *Id.*  In a Facebook post providing a link to the September 14 Article, Tuohy rhetorically asked the question, "Deliberately misleading the consumer in an effort to sell a product.  Is there a word for that?"  *Id.* ¶ 163 & Ex. F.

FireClean complains, in various iterations, that the September 14 Article is false and defamatory insofar as it states or implies that that FireClean deceived the public or is not "trustworthy," either generally or insofar as it staged the test firing in a misleading way.  *Id.* ¶¶ 160, 162, 163, 165 & Exs. E, F.

### C.    The October 23 Article

Following the September 12 Article, there continued to be public controversy in the firearms community regarding the chemical composition of FIREClean.  *See* Compl. Ex. J. Consequently, Tuohy sought additional scientific testing by independent third party volunteers in

an effort to confirm or refute the results of the tests by the University of Arizona professor. Two additional rounds of testing were performed on FIREClean: one at Worcester Polytechnic Institute ("WPI") involving eighteen samples and at least two different test methodologies (Infrared Spectroscopy and Nuclear Magnetic Resonance), and a second conducted by an unnamed individual with a Ph.D. in Chemistry that compared FIREClean to canola oil and involved additional test methodologies (High Performance Liquid Chromatography and two variants of Nuclear Magnetic Resonance). *See id.* ¶ 101 & Ex. J; Tuohy Decl. ¶ 11. The WPI tests were conducted by co-defendant Baker, who received assistance from at least two WPI professors and used highly sophisticated equipment at the WPI laboratories to conduct the tests. *See* Compl. Exs. J (October 23 Article) & K (Baker, on his own blog, identifying faculty who provided academic guidance regarding appropriate methodologies and testing techniques).

On October 23, 2015, Tuohy posted an article titled "A Closer Look at FireClean and Canola Oil," discussing the results of these two sets of tests (the "October 23 Article"). *Id.* ¶ 99 & Ex. J. As the Court can determine for itself by reviewing the article, Tuohy reproduced detailed charts and data from the tests and linked to additional information and explanations about the methods used. *Id.* ¶¶ 99, 110 & Ex. J. Tuohy quoted the conclusions of the scientists who conducted the tests and the bases for their opinions. *See, e.g.*, Compl. Ex. J. Tuohy also obtained an independent review of the test results from two other individuals with backgrounds in Chemistry who had not been involved in conducting the tests. Compl. Ex. J. Tuohy included their analysis, confirming the testers' conclusions, and the scientific bases for those opinions. *Id.*

Tuohy offered praise for FireClean, writing, "As I have continued to state since forming an opinion on the product, *FireClean works very well as a lubricant for the AR-15*," and further added that it was a "good lubricant." *Id.* (emphasis in original). But, based on all of the test

8

results and comments from experts, Tuohy also wrote:  "According to every PhD who looked at the [Nuclear Magnetic Resonance] results, FireClean and Canola oil appear to be 'effectively' or 'nearly' identical."  *Id.*. ¶ 102 & Ex. J.  The October 23 Article concluded:

> FireClean is, as stated previously on this blog, a common vegetable oil, with no evidence of additives for corrosion resistance or other features. The science is solid in this regard.  Questions or concerns about the limited value of IR testing should be, I would think, put to rest with two discrete tests – tests regarded as "the gold standard in analytical chemistry" – and analysis by multiple sources.

> Viewed in this light, FireClean's recent claims that using cooking oils such as canola oil on your firearm could lead to serious injury or death are simply laughable.  They also claimed that it should not be used for cooking due to health concerns – but they also claim that it's non-toxic. Well, which is it?

> I have absolutely no issue with the concept of making money (I applaud those who make money hand over fist), or taking a product from one sphere and introducing it to another.  I think a certain amount of "finder's fee" is absolutely reasonable.  If they discovered that the product would work as a gun oil, introduced it to the gun world, etc., then they did people a favor by telling them about something they never would have discovered on their own.  There are also marketing costs, packaging, etc.  We couldn't expect them to sell a 2oz bottle of Fireclean for the same per ounce price as a gallon of Walmart brand Canola oil.

> That said, I don't think I could look someone in the eye and tell them that a bottle of vegetable oil was the most advanced gun lube on the planet, but those who can?  Well, they're good salesmen, I guess.

> What I do take issue with are attempts to mislead consumers and distort the facts.  There is a line between being an aggressive and effective salesman and not being entirely truthful about your product, the way it works, or what it contains.  It is my belief that FireClean crossed that line long ago – and that many of their recent statements are simply egregious.

*Id.* Ex. J.

Tuohy also posted a short statement on the Vuurwapen Blog's Facebook page with a link to the October 23 Article, summarizing the longer article.  *Id.* ¶ 100.  In a separate response to a

comment on the October 23 Article, Tuohy wrote, "But knowing that FireClean has been willing to manipulate testing to make themselves look good, why would you trust anything they say?" *Id.* ¶ 124 & Ex. N.

FireClean complains, in approximately a dozen iterations, that these statements are false and defamatory insofar as they state or imply that (1) FireClean lies to the public, (2) FIREClean is "effectively" or "nearly" identical to the common household product canola oil, (3) FIREClean is not fit for its intended purpose, (4) FireClean overcharges for the product, and (4) that FireClean manipulated the Vicker's Tactical video test. *Id.* ¶¶ 177, 179.

### D.      The January 18, 2016 Facebook Post

On January 18, 2016, Tuohy wrote a post on Facebook, referencing an article he had written for a website, Lucky Gunner, in 2013. *Id.* ¶ 137. That article reviewed how the use of different kinds of ammunition – brass and steel-cased – affected AR-15 rifles after firing 40,000 rounds. The article had nothing to do with FireClean. *See Id.* Ex. Q.

The Facebook post reminded readers that no amount of care spares a gun owner from needing to perform regular cleaning and maintenance. *Id.* The post included a picture showing the amount of carbon visible on a gun that had been fired 5,000 times and that also had the benefit of FIREClean lubrication. *Id.* ¶ 138. Tuohy wrote, "The oil used was FireClean. Keep this photo in mind the next time you see an image of a dirty AR BCG with '10,000 rounds and no cleaning' that looks much wetter and cleaner than this one. People lie for the strangest reasons but one of the more common reasons is to separate you from your money. Question people when they make statements you find hard to believe. Don't be a fool. Be an educated consumer." *Id.* ¶ 138 & Ex. Q. One member of the public posted a comment on Facebook that included a picture of Crisco oil and asked, "Speaking of FireClean, is this a good deal?" Tuohy posted a response that said "Canola oil. Go for the green cap.*" Id.* ¶ 140 & Ex. R.

10

FireClean complains that these statements are false and defamatory insofar as they state or imply that (1) it has deceived the public and (2) its product is like canola oil. *Id.* ¶¶ 189, 191.

## ARGUMENT

## I.     THIS COURT LACKS PERSONAL JURISDICTION OVER TUOHY

Although FireClean's Complaint should be dismissed on its merits for multiple reasons, *see infra*, there is a preliminary obstacle to its suit:  Tuohy is not subject to jurisdiction in Virginia and this action should be dismissed as against him pursuant to Fed. R. Civ. P. 12(b)(2). The *plaintiff* "bears the burden of proving to the court the existence of personal jurisdiction over the defendant by a preponderance of the evidence." *KMLLC Media, LLC v. Telemetry, Inc.*, No. 1:15cv432 JCC/JFA, 2015 WL 6506308, *3 (E.D. Va. Oct. 27, 2015) (appeal filed Nov. 30, 2015) (citing *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005)).  Here, as a matter of law, FireClean is unable to meet its burden.  FireClean asserts that Tuohy "caused tortious injury in Virginia, and engaged in a persistent course of conduct in Virginia," Compl. ¶ 5, and it makes various conclusory allegations of contacts by Tuohy with Virginia that purportedly support these twin assertions, *id.* ¶¶ 6-14.  None of the allegations, however, is relevant to establishing personal jurisdiction under applicable law.

"The determination of whether the Court can assert personal jurisdiction over a nonresident defendant involves two steps: (1) whether the state's long arm statute authorizes the exercise of jurisdiction; and (2) if so, whether the exercise of jurisdiction comports with due process requirements under the Fourteenth Amendment." *KMLLC Media*, 2015 WL 6506308 at *3 (internal quotation marks and citations omitted).  "Because Virginia's long arm statute is intended to extend personal jurisdiction to the outer limits of due process, the constitutional and statutory inquiries merge." *Id.*  Accordingly, a court evaluating personal jurisdiction must ask

whether the requirements of "general" or "specific" jurisdiction are satisfied, and whether a

"nonresident defendant [has] sufficient 'minimum contacts' with the forum state such that 'the

maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"

*Id*. (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

### A.     Tuohy Is Not Subject To General Jurisdiction

As the Supreme Court has emphasized, "only a limited set of affiliations with a forum

will render a defendant amenable to all-purpose [or general] jurisdiction there." *Daimler AG v.

Bauman*, 134 S. Ct. 746, 760 (2014). "A defendant must have 'continuous and systematic'

affiliations with the State 'as to render [it] essentially at home in the forum State.'" *KMLLC

Media*, 2015 WL 6506308 at *4 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564

U.S. 915, 919 (2011)). "Absent exceptional circumstances, the defendant is only subject to the

general jurisdiction of the forum state if it is the defendant's domicile." *Id*. (citing *Daimler*, 134

S. Ct. at 760). Tuohy, an Arizona resident who is employed as a hiking guide in that state, does

not reside in Virginia, does not own real estate, pay taxes, or hold any assets in Virginia, and

does not work in, employee persons in, or regularly travel to Virginia. Tuohy Decl. ¶¶ 2, 4-5.

Those indisputable facts should end the inquiry into general jurisdiction

### B.     Tuohy Is Not Subject To Specific Jurisdiction

Tuohy, the Arizona-based author of a blog covering all aspects of firearms use and safety,

in no way has targeted a Virginia audience, either with the blog generally or any of the specific

posts at issue. For this reason, despite the fact that a Virginia company alleges it was defamed,

the Constitution protects Tuohy from having to defend his published statements here.

"To determine whether the Court can assert specific jurisdiction over the defendant, the

Court asks: '(1) the extent to which the defendant has purposefully availed itself of the privilege

of conducting activities in the state; (2) whether the plaintiff['s] claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'"  *Id.* at *6 (quoting *Carefirst*, 334 F.3d at 397).

FireClean's primary allegation in support of specific jurisdiction is the conclusory assertion that Tuohy, by publishing material online concerning FireClean's products while aware that FireClean was located in Virginia and had customers in Virginia, demonstrated "his intent to aim his defamatory publications, and his conspiracy, into Virginia."  Compl. ¶ 8.  But the Supreme Court has rejected this argument.  *See Walden v. Fiore*, 134 S. Ct. 1115, 1125 (2014) ("[M]ere injury to a forum resident is not a sufficient connection to the forum.  Regardless of where a plaintiff lives or works, an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State.").

More specifically, it is well-settled that mere publication of an allegedly defamatory statement on the internet is insufficient to confer personal jurisdiction in the forum where the plaintiff resides or those who know the plaintiff can access it.  *Young v. New Haven Advocate*, 315 F.3d 256, 263 (4th Cir. 2002) ("'[A] person's act of placing information on the Internet' is not sufficient by itself to 'subject[ ] that person to personal jurisdiction in each State in which the information is accessed.'  Otherwise, a 'person placing information on the Internet would be subject to personal jurisdiction in every State,' and the traditional due process principles governing a State's jurisdiction over persons outside of its borders would be subverted.") (quoting *ALS Scan, Inc. v. Digital Service Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002)). Where articles are published over the Internet from outside of the state, as is the case here, personal jurisdiction only arises within the state where the publisher "manifested an intent to direct their website content … to a Virginia audience."  *Young*, 315 F.3d at 263.  Mere

13

knowledge of the plaintiff's whereabouts is not evidence of the requisite intent.

For example, in *Young*, the Fourth Circuit held there was no personal jurisdiction where a Connecticut newspaper published on the internet an article about the transfer of Connecticut prisoners to a prison in Virginia over which the plaintiff presided as warden, despite the facts that the article discussed that Virginia facility in detail and highlighted claims of harsh conditions there. *Id.* Similarly, in *KMLLC Media*, this Court determined that no personal jurisdiction existed in a case where defendants produced a report, distributed to media outlets, that contained allegations about the plaintiff company's involvement in a fraudulent Internet video advertising scheme, even where plaintiff alleged that the attack on its credibility was intentional. *KMMLC Media*, 2015 WL 6506308 at *7, 9 (rejecting argument that personal jurisdiction was satisfied by allegation that defendants "knew their Report and the Article would cause harm to Knowlera in Virginia [because Knowlera is located in Virginia]—but simply did not care").

Critical to the analysis in *Walden*, *Young*, and *KMMLC Media* is an inquiry as to whether the forum state had any actual impact on the "focal point" of the publication in question. The answer turns on whether "Plaintiff 'would have experienced [the same harm] wherever else they might have [been headquartered] and found themselves [answering to clients]' who read the article." *KMMLC Media*, 2015 WL 6506308 at *9 (quoting *Walden*, 134 S. Ct. at 1125). As in *KMMLC Media*, any such Virginia focal point is lacking here. While the publications in question relate to a product of a Virginia company, the commentary, which is technical and focused on the chemical composition of FIREClean, has nothing at all to do with Virginia. *See KMMLC Media*, 2015 WL 6506308 at *9 ("Aside from identifying Plaintiff's location in Great Falls, Virginia, the Report focused on 'a ghosting vehicle and its ability to convert one purchased low level in banner online video advertising impression into multiple saleable pre-roll

impressions with faked results' using highly technical, market-focused jargon. . . . There is simply no focus on Virginia."); *see also Falwell v. Cohn*, No. CIV.A.6:02-CV-40, 2003 WL 751130, at *3 (W.D. Va. Mar. 4, 2003) ("Mr. Cohn's site does not discuss anything that relates specifically to Virginia.  Although Reverend Falwell's church and many of his followers are located in Lynchburg, Virginia, he is self-admittedly a nationally known religious figure.").[3]

Because FireClean cannot show that anything Tuohy published was actually aimed at or focused on Virginia, it attempts to bootstrap a finding of jurisdiction in other ways.  Specifically, it claims that the court has personal jurisdiction because (1) Tuohy exchanged phone calls and text messages with FireClean managers seeking comment; (2) Tuohy's blog is "interactive" and read by Virginia residents; (3) Tuohy "uses computer networks in Virginia" to send emails to his readers, including those in Virginia; and (4) Tuohy, at some unspecified point, "purchas[ed] and/or request[ed]" samples of FIREClean.  Compl. ¶¶ 7, 10, 11, 12, 14.  None of these alleged contacts with Virginia, however, can support a finding of personal jurisdiction.

First, as Virginia courts have explained, "[m]iniscule contacts such as telephone conversations, telex messages, and letters negotiating a business transaction have been held insufficient to form a basis for in personam jurisdiction."  *Barry v. Whalen*, 796 F. Supp. 885, 890 (E.D. Va. 1992).  In *KMLLC Media*, this Court held that no specific jurisdiction existed even

---

[3] In a case preceding *Walden* and written long before widespread internet publication, by contrast, the Supreme Court held that personal jurisdiction was proper in California over Florida residents who had written an article about a television entertainer based in California.  *Calder v. Jones*, 465 U.S. 783, 790 (1984).  However, in that case the Court explicitly found that California *was* the focal point of the story, relying heavily on the facts that (1) about 600,000 copies of the magazine in question were distributed in California, nearly twice the amount published in any other state and a clear centerpiece of the magazine's intended audience, (2) the television entertainer's entire professional career was centered in and dependent on California (the heart of the entertainment industry), and (3) the reporter made "frequent" trips and phone calls to California.  *Id.* at 785-86. 789-90.  Moreover, neither the magazine nor the distributing company in that case challenged personal jurisdiction.  *Id*. at 785.  Here, by contrast, the only relevant pleaded fact concerning the "focal point" of the article is that plaintiff is a Virginia resident.

where defendants had reached out to plaintiff by phone and email while compiling their report, and even though defendants had registered an account with plaintiff's company under a fictitious name. *KMLLC Media*, 2015 WL 6506308 at *10 ("these alleged contacts are minimal in quantity, and are not of the quality which would justify subjecting Defendants to specific jurisdiction for this claim"); *see also Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 279 (4th Cir. 2009) (affirming finding of lack of personal jurisdiction despite exchange of over thirty telephone conversations and emails); *Knight v. Doe*, No. 1:10-cv-887, 2011 WL 2471543, *2, 4  (E.D. Va. June 21, 2011) (finding no personal jurisdiction despite defendant's "repeated" calls to business associates of plaintiff in Virginia).  Here, whatever the precise number of such calls and messages, FireClean alleges only that Tuohy engaged in multiple electronic communications with its principals in the course of gathering information for his publications. Neither the quantity nor the quality of these contacts suffices to establish personal jurisdiction.[4]

Next, FireClean asserts that personal jurisdiction arises because of the "interactive" nature of the Vuurwapen Blog, which allows *any* internet user to post a comment and to which Tuohy may then respond.  Compl. ¶ 10.  Such allegations, too, have repeatedly been rejected. *See Knight*, 2011 WL 2471543, at *3 (court lacked personal jurisdiction despite fact that website could accommodate posts from public because "website lacks any evidence of an intent to target the Commonwealth of Virginia or a Virginia audience"); *Falwell*, 2003 WL 751130 at *1 (court lacked personal jurisdiction despite fact that website contained interactive message board).  In contrast, in those cases in which courts have found personal jurisdiction, the websites at issue typically directed sales into the forum state, or made clear a regional geographic focus.  *See*

---

[4] Separately, FireClean conclusorily asserts that Tuohy "posted public commentary on [its] Facebook page," Compl. ¶ 9, but it alleges no facts to support the allegation, and none of the statements at issue are alleged to have been posted to FireClean's Facebook page.  Even assumed to be true, therefore, this allegation simply is not relevant to jurisdiction.

*Newbold Corp. v. Data Sys. Co.*, No. CIV.A. 706-CV-33, 2006 WL 467979, *4 (W.D. Va. Feb. 28, 2006) (involving website directed into Virginia with express intent to sell product to Virginians); *Hare v. Richie*, No. CIV.ELH-11-3488, 2012 WL 3773116, *11 (D. Md. Aug. 29, 2012) (website directed internet activity into Maryland through explicitly labeled "Baltimore" section).  No such activity or labeling exist here.

Equally insufficient is the allegation, "on information and belief," that Tuohy "uses computer networks in Virginia" to deliver emails to his Virginia readers.  Compl. ¶¶ 11-12.  A few courts have held or observed that the sending of email through a system or server physically located in Virginia (such as via an account with Virginia-based AOL) can support a finding of personal jurisdiction.  *Bochan v. LaFontaine*, 68 F. Supp. 2d 692, 699 (E.D. Va. 1999); *Nathan v. Takeda Pharm. Am. Inc.*, 83 Va. Cir. 216, 2011 WL 8947650, *10 (Va. Cir. Ct. Aug. 2, 2011).  Tuohy's blog is hosted on servers in Arizona.  Tuohy Decl. ¶ 7.  FireClean's conclusory allegation that Tuohy, because his blog sends electronic notices to readers, including Virginia readers, must use a "computer network[] in Virginia," is insufficient.  Of course email must travel over a network in Virginia to be received by a Virginia reader.  But even the court in *Nathan* recognized that this cannot support jurisdiction.  2011 WL 8947650, at *11 (mere sending of emails from Illinois to recipients known to be in Virginia not sufficient to establish jurisdiction).  Accepting FireClean's argument would eviscerate the jurisdictional distinctions set forth in *Young* and *ALS Scan* because *every* Virginia resident accessing a website or email from their home or office in Virginia uses a computing system of some sort to do so.

Finally, FireClean alleges personal jurisdiction exists because Tuohy, at some point, "purchas[ed], and/or request[ed]" samples of FIRECLean.  Compl. ¶ 14.  Leaving aside the obvious and suspicious omission of any details of the supposed sales transaction (date, price,

quantity, means of order placement, delivery address, etc.), such an isolated transaction cannot confer personal jurisdiction for the simple reason that the transaction is not the matter in suit: This is not a contract action arising from alleged failure by Tuohy to make payment for goods. The connection FireClean seeks to draw is simply too attenuated to serve as a basis of personal jurisdiction. *See KMLLC Media*, 2015 WL 6506308 at *8 (finding that defendants' "suit-related conduct, i.e. the creation and publication of the Report, did not 'arise out of contacts that the defendant [itself] create[d] with the forum state'") (quoting *Walden*, 134 S. Ct. at 1121-22; *Nat'l Corp. Hous., Inc. v. Ayers*, No. 1:11-cv-1391 AJT-TCB, 2012 WL 1081170, at *7 (E.D. Va. Mar. 28, 2012) (holding that court lacked personal jurisdiction and observing, "Plaintiff's claims do not arise from Defendants' authorized use of the Plaintiff's computer network, or the employment relationship more generally, but from the Defendants' alleged misuse of information they properly accessed on that network, all of which took place in Ohio.").

Because FireClean has not (and cannot) meet its burden of demonstrating a basis for personal jurisdiction, the Complaint should be dismissed as against Tuohy.

## II.   FIRECLEAN'S DEFAMATION CLAIMS FAIL AS A MATTER OF LAW

In Virginia, the elements of a claim for defamation are "(1) publication of (2) an actionable statement with (3) the requisite intent." *Jordan v. Kollman*, 269 Va. 569, 575 (2005). To be "actionable," the statement must be a factual one capable of being proven false and be defamatory. *Schaecher v. Bouffault*, 290 Va. 83, 98 (2015). In Counts I-IV, FireClean contends that virtually all of Tuohy's published statements about FIREClean's composition, its suitability for certain uses because of that composition, and the credibility of the company's marketing are false and defamatory. (FireClean, of course, does not complain about Tuohy's praise of FIREClean's general performance.) While daunting because of the number of statements at issue, the claims actually may be analyzed by category and, upon examination, it is readily

apparent that almost all of the claims fail as a matter of law because the challenged statements

either are not reasonably capable of conveying the defamatory meaning FireClean attempts to

hang on them, and/or because they are non-actionable expressions of Tuohy's opinion (that is,

they are not provably false factual statements).  Furthermore, *all* of the claims fail for the

independent reason that FireClean has failed to meet its burden of plausibly pleading that Tuohy

published the challenged statements with "actual malice"—that is, knowing them to be false or

having substantial doubts about their truth when he published them.[5]

> **A.   Most Of The Challenged Statements Do Not Reasonably Convey The
> Defamatory Meaning Alleged And/Or Constitute Non-Actionable Opinion**

As noted, for a statement to be actionable as defamation in Virginia, it must be both

defamatory of the plaintiff and capable of being proved false.  *Schaecher*, 290 Va. at 98.  Not all

derogatory statements rise to the level of "defamation," and not all assertions are capable of

empirical verification.

"In Virginia, a statement is defamatory if it 'tends to injure the reputation of the party, to

throw contumely, or to reflect shame and disgrace upon [the party], or to hold [the party] up as

an object of scorn, ridicule or contempt.'"  *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1104-

05 (4th Cir. 1993) (citation omitted).  Courts are clear that "'language that is insulting, offensive,

or otherwise inappropriate, but constitutes no more than 'rhetorical hyperbole' is not

defamatory."  *Schaecher*, 290 Va. at 92 (quoting *Yeagle v. Collegiate Times*, 255 Va. 293, 296

(1998)).  "[T]he question of whether [a publication] is reasonably capable of the defamatory

---

[5] FireClean recounts in its Complaint comments made by readers of the Vuurwapen Blog, as well as articles from websites with no connection to Tuohy.  Compl. ¶¶ 64-66, 88-98, 125-27.  Why FireClean includes them is unclear, but Tuohy clearly is not liable for them.  As the operator of an interactive website, he is shielded by statute from liability for posts by commenters.  *See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009) (47 U.S.C. § 230 "bar[s] state-law plaintiffs from holding interactive computer service providers legally responsible for information created and developed by third parties").  And it is obvious Tuohy has no liability for what other publishers have said on their own websites about FireClean.

meaning [plaintiff] ascribes to it is a question of law, not fact." *Webb v. Virginian-Pilot Media Companies, LLC*, 287 Va. 84, 90 (2014).  Separating statements capable of defamation from those that merely "inflame" is "an essential gatekeeping function of the court." *Id*.  When evaluating whether a statement is reasonably capable of the defamatory meaning a plaintiff alleges it conveys, the Court must "'assess how an objective, reasonable reader would understand a challenged statement by focusing on the plain language of the statement and the context and general tenor of its message.'" *Jackson v. Ocwen Loan Servicing, LLC*, No. 3:15-cv-238, 2016 WL 1337263, *7 (E.D. Va. Mar. 31, 2016) (quoting *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 184 (4th Cir. 1998)).  *See also PBM Products, LLC v. Mead Johnson Nutrition Co.*, 678 F. Supp. 2d 390, 401 (E.D. Va. 2009) ("When making this determination, a court may look to . . . the broader social context into which the statement fits.").

Separately, even when defamatory, expressions of opinion generally are not actionable in defamation.  *Fuste v. Riverside Healthcare Ass'n, Inc.*, 265 Va. 127, 132-33 (2003).  This is so because, under the First Amendment, we rely on the marketplace of ideas and not the courts to weed out faulty thinking.  *See Gertz v. Robert Welch Inc.*, 418 U.S. 323, 339-40 (1974) ("However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.").  An expression of opinion, however, may constitute actionable defamation, but "*only* if the opinion can reasonably be interpreted to declare or imply untrue facts."  *PBM Products,* 678 F. Supp. 2d at 401(finding that statements were not actionable because "[c]ommon sense dictates . . . that that neither of these portions can be reasonably interpreted to declare or imply untrue facts.  Rather, these were standard posturing statements of opinion by PBM related to the third lawsuit it had just filed against Mead Johnson.").  Put differently, where a speaker discloses to his audience the facts on which his

20

conclusion is based, "no reasonable reader would consider the [allegedly defamatory conclusion] anything but the opinion of the author drawn from the circumstances related.'" *Biospherics*, 151 F.3d at 185 (citation omitted); *see also, e.g., Moldea v. New York Times Co.*, 15 F.3d 1137, 1144-45 (D.C. Cir. 1994) ("Because the reader understands that such supported opinions represent the writer's interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based upon those facts, this type of statement is not actionable in defamation."). Whether a publication presents an actionable statement of fact or non-actionable opinion is a question of law for the Court appropriate for resolution on preliminary motion. *Cutaia v. Radius Eng'g Intn'l, Inc.*, No. 5:11-cv-00077, 2012 WL 525471, *3 (W.D. Va. Feb. 16, 2012); *Chaves v. Johnson*, 230 Va. 112, 119 (1985). As when evaluating defamatory meaning, in assessing whether a statement constitutes opinion, the Court should examine 'the statement's language and context.' This analysis should consider the 'general tenor of the article' as well as whether the language in the article was 'loose, figurative, or hyperbolic.'" *Mirafuentes v. Estevez*, No. 1:15-cv-610, 2015 WL 8177935, *2 (E.D. Va. Nov. 30, 2015) (quoting *Biospherics*, 151 F.3d at 183).

In this regard, the general and specific contexts of Tuohy's publications bear emphasis: Tuohy was writing product opinions on a specialty blog (and related social media) aimed specifically toward the firearms community, a community in which a significant public controversy regarding the composition and value of FIREClean had been raging for several months. As the Court can determine for itself in reviewing Tuohy's blog and the other examples of publications for this community in the record and that are generally available via the internet to the public, this a community and a forum in which hyperbole, charge and countercharge, and exchange of subjective viewpoints are routine. And the specific dispute that is the subject of the

challenged statements is itself a disagreement over what scientific methodology is most appropriate for undertaking comparison of the relevant chemical attributes of oils.  These are contexts that, by themselves, signal to readers that statements should not always be taken literally, and in event should be taken with a grain of salt.  *See, e.g.*, *Arthur v. Offit*, No. 1:09-cv-1398, 2010 WL 883745, *6 (E.D. Va. Mar. 10, 2010) (noting that "Courts have a justifiable reticence about venturing into the thicket of scientific debate, especially in the defamation context," and holding "Plaintiff may wish to defend in Court the credibility of her conclusions about the dangers of vaccines, the validity of the evidence she offers in support of those theories, and the policy choices that flow from those views—as well as her own credibility for having advanced those position.  These, however, are academic questions that are not the sort of thing that courts or juries resolve in the context of a defamation action."); *Xtreme 4X4 Ctr., Inc. v. Howrey*, 65 Va. Cir. 469, 2004 WL 2709602, *4 (Va. Cir. Ct. Sept. 13, 2004) (considering statements made about products on internet message board and holding, "Nothing within the first statement could be regarded as a fact that could be proven true or false.  While she does compare prices and quality of parts—with the implication being that 'DC' charges less than Xtreme for better parts—these statements depend upon the speaker's viewpoint and are, therefore, opinion."); *Couloute v. Ryncarz*, No. 11-CV-5986-HB, 2012 WL 541089, *6 (S.D.N.Y. Feb. 17, 2012) ("Defendants state that Plaintiff 'lied and cheated all through his 40 years of life', and that, because Plaintiff is an attorney, 'he's great at lying and covering it up without batting an eye.' Comments such as these are clearly hyperbolic.  And when viewed within the larger context of the website on which they were posted, there can be no doubt that a reasonable reader would understand the comments to be opinion."); *Seaton v. TripAdvisor LLC*, 728 F.3d 592, 600 (6th Cir. 2013) ("[T]he broader context into which the '2011 Dirtiest Hotels list' fits supports our

22

conclusion that TripAdvisor's placement of Grand Resort on that list cannot reasonably be interpreted as stating an actual fact."); *see also Cutaia*, 2012 WL 525471 at *7 (collecting cases regarding analysis of actionable opinion in the context of commercial and employment matters and holding "Plainly, Cutaia's statement about spending a lot of money, concern over Radius' competence, and assertion that Radius did not properly perform its contractual duties are wholly dependent on Cutaia's viewpoint and not subject to objective verification.").

As noted, Tuohy's foray into this on-line debate was prompted by a claim by one of FireClean's competitors (currently a defendant in another defamation action by FireClean) that FIREClean was no more than Crisco. He set out to test that claim and report the results to the community engaged in that debate. When the Court applies these well-established legal principles to the statements challenged here by FireClean in the full context in which they were made, it is apparent that all but one category of FireClean's defamation claims against Tuohy fail as a matter of law.[6]

### 1.    The "vegetable oil" statements

FireClean alleges in Counts I, III and IV of its Complaint that it is defamatory and false for Tuohy to have said or implied that FIREClean is, or is "virtually the same as" vegetable oil, or a "common grocery store cooking product," or similar verbal formulations comparing FIREClean to cooking oils. Compl. ¶¶ 148, 150, 177, 179, 189. FireClean alleges that such statements are defamatory because they imply that it is overcharging for a re-packaged, commonly available product that won't function as advertised and that, as a consequence, it has

---

[6] Tuohy excludes from this argument the portion of FireClean's claims concerning his statements to the effect that it had "manipulated" or faked the specific test portrayed in the Vicker's Tactical video. Compl. ¶¶ 160(c)-(f), 162(c)-(f), 163, 165, 177(j), 179(j). These claims fail for the reason set forth in Section II.B *infra*, and also because Tuohy's statements are true (an issue properly raised on motion for summary judgment and not in this preliminary motion).

deceived the public.  *See id.*  But the specific statements at issue, considered in context, do not reasonably communicate these allegedly defamatory implications, and are in any event expressions of opinion based on facts (the results of various tests) disclosed to the readers.

First, there is nothing derogatory to FireClean's business in statements to the effect that the gun oil FIREClean is like a household cooking oil – Tuohy's statements in this regard say nothing at all about the product's ability to function as a gun oil.  *See Felming v. Moore*, 221 Va. 884, 891 (1981) (charging teacher with racism not defamatory *per se* because "statements did not necessarily affect [plaintiff] in his particular profession").  In fact, as FireClean acknowledges, Tuohy himself pointed out that canola oil has "a long history of use as an industrial lubricant for metal-to-metal contact."  Compl. ¶ 100 & Ex. J.  Tuohy also observed that "FireClean works very well as a lubricant for the AR-15" and that it is a "good lubricant" in general.  *See* Compl. Ex. J.  Indeed, while FireClean disputes that its product is composed of a "single vegetable oil," it admits that it *is* composed of "at least three oils, each of which is a natural, non-petroleum, non-synthetic oil derived from a plant, vegetable or fruit or shrub or flower or tree nut."  Compl. ¶ 114.  Setting aside whether this admission demonstrates the truth of Tuohy's statements that the product is or is like vegetable oil, given that FireClean itself touts this fact, in its patent application among other places, it can hardly be defamatory.  It is only FireClean, not Tuohy (and not any reasonable reader of his statements), that makes the leap from the general observations that FIREClean is like vegetable oil to the conclusion that it isn't suitable as a gun oil.  The various versions of the "like vegetable oil" statements simply do not bear the defamatory meanings FireClean seeks to attach to them, whether directly or by implication.

Although the Court need go no further to dismiss claims based on the "vegetable oil" statements, in this context, Tuohy's conclusions that FIREClean is or "is like" vegetable oil in its

24

composition also constitute non-actionable expressions of opinion based on accurate facts disclosed to the readers.  Tuohy sets forth in some detail the results of the three rounds of testing he commissioned and provides comments from the testers regarding what they perceive as the implications of those results.  *See generally* Compl. Ex. J.  While FireClean alleges that different tests would be better suited to comparing the products' characteristics, *e.g.,* Compl. ¶ 43, it does not contend that Tuohy misrepresented the results of the tests on which he was reporting, or that the test results themselves were falsified—indeed, FireClean concedes the results are as would be expected, *see, e.g., id.* ¶ 42 (acknowledging results from one test reported by Tuohy "*would be expected* because all three substances contain plant or vegetable-based oils, which are from the same class of compounds: triglycerides") (emphasis added); ¶ 143 (acknowledging that FIREClean, Canola Oil, and Crisco brand vegetable oil "do, in fact, have similar basic patterns as is to be expected").  Even if FireClean genuinely believes there are special chemical properties to its gun oil that make it better than other oils, this does not render Tuohy's expression of his own view that it is not materially different from vegetable oil actionable.  *See Mirafuentes*, 2015 WL 8177935 at *5 ("Estevez stated her opinion on the subject and provided a factual basis for this opinion" and because that factual basis was true, the statement was non-actionable).

This also explains why Tuohy's statement to the effect that he would not recommend FIREClean for use in military applications, Compl. ¶ 148 & Ex. C, and his quotation of the chemistry post-doctoral fellow's statement that gun owners with particular priorities might wish to opt for a "more thermally stable" product, *id.* ¶ 177 & Ex. J, are—considered in their full context— protected opinion.  Tuohy set out for readers each of the facts on which these recommendations are based and, while FireClean plainly disagrees with the suggestion that these types of gun owners might need or prefer a different type of gun oil, readers are free to decide for

themselves whether they agree with Tuohy or with FireClean on these recommendations because the bases for them are set forth in the publication.

### 2.   The "Lies, Errors and Omissions" statements

In Counts I, II and III, FireClean objects to the phrase, "Lies, Errors and Omissions," as a false and defamatory accusation that it "lied about its formulation or performance of its product." Compl. ¶¶ 148, 150; *see also id.* ¶¶ 160, 162, 177, 179.  As is evident from even the most cursory examination of these allegations and the publications on which they are based, however, the phrase "Lies, Errors and Omissions" is the title of a section of the Vuurwapen Blog to which Tuohy posts items involving the examination of industry rumors about a particular product, including certain of the items about FireClean at issue here, and other, unrelated items. *See* Compl. Exs. C, E & J.  Such postings therefore necessarily are located via a URL that would read, in relevant part, "http:www.vuurwapenblog.com/general-opinion/lies-errors-and-omissions/[title of article]."  This section title, or category heading, is not directed at FireClean (or any specific party) and in any event it is clearly hyperbolic and therefore not reasonably capable of conveying the specific defamatory meaning about FireClean that it alleges readers would take merely because an article about FireClean appears in that section on the blog.[7]

---

[7] Count IV, which challenges the January 2016 Facebook post, appears to be based primarily on the phrase "[p]eople lie for the strangest of reasons."  Compl. ¶ 189.  In this regard, FireClean misreads the post because that passage is not directed toward it.  Specifically, the post consists of an introductory comment to a link to an earlier article written by Tuohy on a website called Lucky Gunner in which Tuohy described how using different types of ammunition cartridges affects particular weapons.  Compl. ¶ 138 & Ex. Q.  The introduction summarizes his findings, and notes that, after firing 5,000 rounds of ammunition, even a gun treated with gun oil gets "filthy."  *Id.*  Tuohy observes that "[t]he oil used was FireClean," and then urges readers to keep this photo in mind the next time you see an image of a dirty AR BCG with '10,000 rounds and no cleaning' that looks much wetter and cleaner than this one.  People lie for the strangest reasons but one of the more common reasons is to separate you from your money.  Question people when they make statements you find hard to believe.  Don't be a fool.  Be an educated consumer."  *Id.*  Read in context (with the linked article Tuohy was introducing), it is obvious to a reasonable reader that the reference to "people lying" is to those who boast of maintaining a

### B.     FireClean Has Failed To Plausibly Plead Actual Malice

Counts I-IV for defamation all fail as a matter of law for the independent reason that

FireClean is a limited purpose public figure required to plausibly plead the third element of its

claim, the "requisite intent," which it has failed to and cannot do.  "The requisite intent a plaintiff

must prove in a defamation action depends upon the plaintiff's status as a public or private figure

and the damages sought."  *Jordan*, 269 Va. at 576.  The determination of plaintiff's status for

this purpose is a question of law.  *Fitzgerald v. Penthouse Int'l, Ltd.*, 691 F.2d 666, 669-70 (4th

Cir. 1982).  In determining whether a plaintiff is a limited purpose public figure, the court

evaluates whether (1) plaintiff had access to channels of effective communication to rebut any

defamatory statements; (2) plaintiff voluntarily assumed a role of special prominence in a public

controversy; (3) plaintiff sought to influence the resolution or outcome of the controversy; (4) the

controversy existed prior to the publication of the defamatory statements; and (5) plaintiff

retained public figure status at the time of the alleged defamation.  *Id.* at 668.  "[E]ven

'involuntary' participants can be public figures when they choose a course of conduct which

invites public attention."  *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 709 (4th Cir. 1991).

Each of the elements for public figure status is met here:  FireClean is a prominent gun

oil manufacturer that has availed itself of advertising, industry press, and social media

(including, for example, its own website and the Vickers Tactical video on Youtube) to promote

the special benefits of FIREClean; controversy regarding the composition of FIREClean and the

veracity of FireClean's advertising predated Tuohy's publications challenged here; FireClean

engaged with the public and press in an effort to respond to that public controversy; and

---

clean weapon even after 10,000 rounds have been fired.  Tuohy's post urges readers to be wary
of such boasting because residue builds up substantially after only 5,000 rounds have been fired,
even with the benefit of a gun oil.  Put succinctly, even if the "people lie" statement were
assumed to be defamatory, it is not capable of defaming FireClean because it is not about
FireClean.

FireClean has continued to issue statements and engage with the press on this matter in an effort to influence public opinion.[8]

In order to recover for defamation, therefore, FireClean must prove, by clear and convincing evidence, that Tuohy acted with actual malice in publishing the article, "that is, with knowledge that it was false or with reckless disregard for whether it was false or not." *AdvanFort Co. v. Maritime Executive, LLC*, No. 1:15-cv-220, 2015 WL 4603090, *6 (E.D. Va. July 28, 2015) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)). With regard to the latter, a finding of reckless disregard "requires a determination as to whether there is 'sufficient evidence to permit the conclusion that the defendant *in fact entertained serious doubts* as to the truth of his publication.'" *Id*. at *7 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968) (emphasis added)).

Following the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), federal courts adjudicating defamation

---

[8] *See, e.g.* Compl. at 1 ("FireClean has been a success in testing and in sales, and FireClean's revenues have, until recently, increased by twenty to fifty percent annually since sales began in 2012."); ¶¶ 74-77 (describing Vickers Tactical YouTube video, featuring interviews with Ed and Dave Sugg describing the development of FIREClean and commenting on the testing of FIREClean's performance as a lubricant); Ex. A (Patent application for FIREClean); FireClean, Facebook, *available at* https://www.facebook.com/fireclean/?rc=p (FireClean's public Facebook page, with 37,824 "likes" (as of May 16, 2016), as well as hundreds of promotional posts and pictures featuring FIREClean, including several featuring the Vuurwapen Blog); John Connor, *Goops, soups & sauces: chemical cocktails for your cannon*, Guns Magazine, Oct. 1, 2013 at 78 (review of FIREClean as gun lubricant); Press Release, FireClean, "FIREClean Issues Statement: Warning Public of Importance of Using Firearms-Specific Oils Properly," Sept. 22, 2015 (stating that "FIREClean is not re-labeled Crisco, nor is it relabeled canola oil or simple vegetable oil. … 'FIREClean is a patent pending extreme performance gun oil. It is odorless, biodegradable, safe, and made in the USA. A product like FIREClean has undergone years of research, development, and testing requiring firing hundreds of thousands of rounds of ammunition and about as many dollars. . . . confirmed [FIREClean counsel Matthew] Bergstrom."), *available at* http://www.prweb.com/releases/2015/09/prweb12974454.htm; Press Release, FireClean, Oct. 2, 2015 ("FIREClean has been marketed since mid-2012 and has been used by many thousands of customers since with millions of rounds fired commercially, within law enforcement and by the military. [Founder Ed] Sugg confirmed, 'It is combat proven in some of the harshest conditions on the planet.'"), *available at* http://www.prweb.com/releases/2015/10/prweb13000060.htm .

actions brought by public figures have made clear that unadorned allegations that a defendant acted with actual malice are insufficient to state a viable claim. *Mayfield v. NASCAR*, 674 F.3d 369, 377 (4th Cir. 2012) (rejecting argument that allegations of actual malice "need only be articulated in the most general terms"); *Michel v. NYP Holdings, Inc.*, No. 15-11453, 2016 WL 860647, at *11 (11th Cir. Mar. 7, 2016) ("every circuit that has considered the matter . . . has held that a defamation suit may be dismissed for failure to state a claim where the plaintiff has not pled facts sufficient to give rise to a reasonable inference of actual malice."); *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 56 (1st Cir. 2012) (holding that plaintiff's "complaint used actual-malice buzzwords . . . [b]ut these are merely legal conclusions, which must be backed by well-pled facts"); *accord Biro v. Condé Nast*, 807 F.3d 541, 544-45 (2d Cir. 2015), *cert. denied* 2016 WL 880826 (May 16, 2016); *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013). Instead, a plaintiff must provide enough facts "to raise" the existence of actual malice "above the speculative level." *Mayfield*, 674 F.3d at 377.

Here, FireClean has done no more than use "actual-malice buzzwords." Compl. ¶¶ 152-54, 168-69, 182-82, 193-94. Completely missing from the Complaint are any allegations of facts (much less clear and convincing facts) from which a reasonable jury could conclude that Tuohy knew what he published was false or seriously doubted its truth at the time of publication. For this additional and independent reason, Counts I-IV should be dismissed as against Tuohy.

## III.   PLAINTIFF'S CONSPIRACY CLAIMS FAIL AS A MATTER OF LAW

In Counts VI and VII, FireClean purports to state claims for statutory and common law conspiracy premised exclusively on the allegations of defamation in Count III. Compl. ¶¶ 210-224, 225-239. Because Count III fails as a matter of law for the reasons stated above, its related

conspiracy claims must also be dismissed pursuant to Rule 12(b)(6).  *See Spencer v. American Int'l Grp., Inc.*, No. 3:08-CV-591, 2009 WL 47111 (E.D. Va. Jan. 6, 2009).

FireClean's conspiracy claims also fail for the independent reason that it has failed to adequately plead *any* concerted action between Tuohy and Baker that would demonstrate a preconceived plan to injure Plaintiff's business.  Both forms of the claim require that "the plaintiff must first allege that the defendants combined together to effect a 'preconceived plan and unity of design and purpose.'"  *Bay Tobacco, LLC v. Bell Quality Tobacco Prods., LLC*, 261 F. Supp. 2d 483, 499 (E.D. Va. 2003) (internal citations omitted).  This concerted action must be pled with particularity, and must be pled "in more than mere conclusory language."  *Id*.  Here, however, none of the allegations in the Complaint come close to demonstrating a "preconceived plan" for the purpose of injuring FireClean.  Rather, the allegations are the epitome of conclusory language.  *See, e.g.,* Compl. ¶¶ 218, 233.

## CONCLUSION

For the foregoing reasons, Tuohy respectfully requests that the Court dismiss the Complaint as against him.

Dated:  May 19, 2016

Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ, LLP

By: _____ /s/ *Jay Ward Brown* _____
Jay Ward Brown, Va. Bar No. 34355
1899 L Street, N.W., Suite 200
Washington, DC  20036
Telephone:  (202) 508-1100
jbrown@lskslaw.com

*Counsel for Defendant Andrew Tuohy*

### CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of May, 2016, a true and correct copy of the

foregoing DEFENDANT ANDREW TUOHY'S MEMORANDUM OF LAW IN SUPPORT OF

HIS MOTION TO DISMISS THE COMPLAINT was served via this Court's ECF system on

counsel for Plaintiff, as follows:

> Bernard Joseph DiMuro, Va. Bar No. 18784
> Stacey Rose Harris, Va. Bar No. 65887
> DiMuro Ginsburg PC
> 1101 King Street, Suite 610
> Alexandria, VA  22314-2956
> Telephone:  (703) 684-4333
> Facsimile: (703) 548-3181
> Email:  bdimuro@dimuro.com
>
> *Counsel for Plaintiff FireClean LLC*

> _____/s/ Jay Ward Brown_____
> Jay Ward Brown, Va. Bar. No. 34355
> LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.
> 1899 L Street, N.W., Suite 200
> Washington, DC  20036
> Telephone:  (202) 508-1100
> Facsimile:  (202) 861-9888
> Email:  jbrown@lskslaw.com
>
> *Counsel for Defendant Andrew Tuohy*