IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FIRECLEAN, LLC,                    )
                                   )
     Plaintiff,                    )
                                   )
          v.                       )   Case No. 1:16-cv-0294
                                   )
ANDREW TUOHY, ET AL.,              )
                                   )
     Defendants.                   )

**MEMORANDUM OPINION**

        This online defamation lawsuit is before the Court on

Defendants' motions to dismiss for lack of personal jurisdiction

and failure to state claims upon which relief can be granted.

For the following reasons, the Court will dismiss for lack of

personal jurisdiction.  Accordingly, the Court will not reach

Defendants' arguments for dismissal on the merits.

**I.        Background**[1]

        Plaintiff FireClean, LLC ("Fireclean") is a Virginia

limited liability company that manufactures gun oil.

Fireclean's members are natural persons residing in Virginia.

---

[1]        Because the Court has not conducted an evidentiary
hearing, the facts are stated in the light most favorable to
Plaintiff and all factual disputes are resolved in Plaintiff's
favor.  *See Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir.
2016); *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs.,
Inc.*, 334 F.3d 390, 396 (4th Cir. 2003).

(Compl. [Dkt. 1] ¶ 1.)  Defendant Andrew Tuohy ("Tuohy") is a citizen and resident of Arizona who maintains a firearms blog and accompanying Facebook page.  (Compl. ¶¶ 2, 10.)  Defendant Everett Baker ("Baker") is a chemistry student at a Massachusetts technical institute, a citizen of New Hampshire, and maintains a firearms blog.[2]  (Compl. ¶¶ 2, 17; Def. Baker Mem. in Supp. [Dkt. 15] at 1.)

Plaintiff manufactures and sells a patent-pending oil called "FIREClean" ("FIREClean" or the "Product") that is advertised to reduce carbon residue buildup in firearms. Brothers Ed and David Sugg invented the Product and own Plaintiff Fireclean.  Their Product is a blend of at least three natural oils derived from a plant, vegetable, fruit, shrub, flower, or tree nut.  (Compl. ¶ 25.)  Plaintiff alleges that the Product is not common canola or soybean oil, and is not Crisco or any other relabeled or repackaged consumer product.  (Compl. ¶¶ 26-32.)

Around August 2015, various blogs and social media websites began to publish that FIREClean is nothing more than a common vegetable oil or Crisco.  (Compl. ¶ 38; Compl. Ex. C

---

[2]    This case satisfies the subject matter jurisdiction requirements of 28 U.S.C. § 1332(a) because Plaintiff is a citizen of Virginia and Defendants are citizens of Arizona and New Hampshire.  Furthermore, Plaintiff estimates its damages at $150,000 to date.  (Compl. ¶ 136.)

[Dkt. 1-3] at 1.)  Nonparty George Fennell, who makes a competing gun oil, appears to be the originator of those criticisms.  (Compl. ¶ 66; Compl. Ex. C at 1.)[3]  Fennell posted a video online purporting to demonstrate that FIREClean was "pretty much a Crisco oil" and another video allegedly shows FIREClean and Crisco smoking and burning on a stove at the same temperature.  (Compl. ¶ 66; Compl. Ex. C at 1.)  Plaintiff filed a defamation and false advertising lawsuit against Fennell on the same day it filed the present lawsuit.  *See FireClean, LLC v. Fennell*, 1:16-cv-293 (E.D. Va. filed Feb. 17, 2016).[4]

Defendant Tuohy maintains a firearms website called Vuurwapen Blog.[5]  (Compl. ¶ 13.)  Around August 2015, Tuohy became interested in the online allegations that FIREClean is chemically indistinguishable from common cooking oil.  (Compl. ¶ 66; Compl. Ex. C at 1; Tuohy Decl. [Dkt. 12-2] ¶ 9.)  Tuohy sent Ed Sugg a Facebook message asking "Ed, Do you guys have a response to the claims that FireClean is just Crisco?"  (Compl.

---

[3]     Page number citations for exhibits refer to the pagination assigned by the Electronic Case Management system.
[4]     On July 1, 2016, the Honorable Judge Ellis denied Fennell's motion to transfer to a more convenient forum and denied a motion to dismiss for failure to state a claim.  *See* Order, *FireClean, LLC v. Fennell*, 1:16-cv-293 (E.D. Va. July 1, 2016), ECF No. 49.  Fennell did not challenge personal jurisdiction in Virginia.
[5]     "Vuurwapen" means "firearm" in Dutch.  (Def. Tuohy Mem. in Supp. [Dkt. 12-1] at 1.)

3

¶ 34.)  Ed briefly responded, "Hi Andrew-categorically deny.  If you let me know where you are hearing it I would appreciate it.  If it's a competitor it will generate a strong response.  Thanks!  Ed."  (Compl. ¶ 35; Compl. Ex. B [Dkt. 1-2].)

Despite that assurance, Tuohy remained curious and continued to investigate the chemical composition of FIREClean.  In early September 2015, Tuohy asked a chemistry professor at the University of Arizona to perform a test called an Infrared Spectroscopy to compare the chemical structures of FIREClean, canola oil, and soybean oil.  (Compl. ¶ 39.)  Tuohy informed Ed Sugg by email that the professor's testing indicated FIREClean "was probably a modern unsaturated vegetable oil virtually the same as many oils used for cooking."  (Sugg Decl. Ex. 1 [Dkt. 36-1] at 5.)  Tuohy planned to publish a blog article on the tests and asked Ed for a response.  (*Id.*)  Through "several emails," Ed declined to comment on FIREClean's formula, but requested several days to review the article and to draft a response.  (*Id.*; Tuohy Decl. ¶ 10.)

The next day, September 12, 2015, Tuohy published the article on his blog under the title "Infrared Spectroscopy of Fireclean and Crisco Oils."  (Compl. Ex. C [Dkt. 1-3].)  The article summarized the recent allegations that FIREClean was "nothing more than Crisco vegetable oil," discussed the

4

chemistry professor's testing, and summarized the professor's findings as showing that **"FireClean is probably a modern unsaturated vegetable oil virtually the same as many oils used for cooking."**  (Compl. Ex. C at 3 (emphasis in original).)  The article also noted that Tuohy "spoke at length" with Ed Sugg, who assured Tuohy that neither Crisco nor soybean oil is part of the FIREClean formula.  (*Id.* at 1.)  Despite that assurance, the professor's testing led Tuohy to "not recommend FireClean be used by members of the military."  (*Id.* at 4.)

Two days later, Tuohy posted an article on the Vuurwapen Blog entitled "Where There's Smoke, There's Liars." (*See* Compl. Ex. E [Dkt. 1-5].)  The article accused the video's producer and the Sugg brothers of rigging the results of a test that was meant to compare the carbon-reducing properties of FIREClean and another gun oil.  Tuohy explained why he believed the test was rigged and wrote that his discovery "calls into question any claim or statement made by FireClean as a company and Ed and Dave Sugg as individuals."  (Compl. ¶ 73.)

The above articles stirred the controversy regarding FIREClean's chemical composition and led to a torrent of critical online commentary, including comments on Tuohy's blog, negative reviews on Amazon, and at least one spin-off article

repeating Tuohy's Infrared Spectroscopy findings.  (*See* Compl. ¶¶ 60-65, 88-98.)

Defendant Everett Baker, a chemistry undergraduate student in Massachusetts who maintains a firearms blog, saw Tuohy's article and became interested in the science discussed therein.  (Tuohy Decl. [Dkt. 12-2] ¶ 9.)  Baker contacted Tuohy and offered to perform a new round of tests using his university's sophisticated equipment.  (Compl. ¶ 212; Compl. Ex. J [Dkt. 1-10] at 1; Compl. Ex. K [Dkt. 1-11] at 2.)  Tuohy liked the idea of additional testing and sent Baker some FIREClean and other oils to serve as the samples.  (Compl. ¶ 213.)  Baker then worked under the supervision of his professors in Massachusetts to compare FIREClean with other oils through an Infrared Spectroscopy[6] and a Nuclear Magnetic Resonance Spectroscopy[7].

---

[6]     According to Baker's report, an Infrared Spectroscopy "uses infrared light to bend and stretch the bonds in organic molecules.  Different bonds have different strengths, so it will take different amounts of energy to cause a change. . . . Depending on the two atoms bonded, a given wavelength of IR light will cause bonds to stretch, bend, rock, or twist.  By looking at the wavelength of light that the sample absorbs, we can know the energy level that is going into changing the bonds." (Compl. Ex. K at 6-7.)  The instrument performing the test produces a report that shows "what bonds the samples have in common." (*Id.* at 7.)

[7]     Baker describes the Nuclear Magnetic Resonance Spectroscopy as follows: "NMR is a complicated but extremely useful method of analysis.  Several of my professors have described it as 'the gold standard in analytical chemistry,' and for good reason.  When combined with other methods of analysis

(*See* Compl. Ex. K.)  On October 19, 2015, Baker posted a summary of his testing procedures on his firearms blog, Granite State Guns, under the title "How to Science."  (Compl. Ex. K.)  The article, however, did not reveal the test results because Baker did not want to "beat [Tuohy] to the punch."  (*Id.* at 11.)

Tuohy published those results on October 23, 2015, in a Vuurwapen Blog article entitled "Lies, Errors and Omissions," but later changed the title to "A Closer Look at Fireclean and Canola Oil."  (Compl. Ex. J.)  The article summarized Baker's testing along with the results of three other tests performed in a different lab by an individual with a Ph.D. in chemistry. (*Id.* at 1.)  Before quoting from the scientists' reports at length, Tuohy summarized that "***According to every PhD who looked at the NMR results, FireClean and Canola oil appear to be 'effectively' or 'nearly' identical.***"  (*Id.* at 1 (emphasis in original).)  After disclosing the scientists' findings, Tuohy concluded by praising FIREClean as a "good lubricant" that works "very well as a lubricant for the AR-15."  (*Id.* at 5-6.)  But he also stated that FIREClean is "a common vegetable oil, with no evidence of additives for corrosion resistance or other features."  (*Id.* at 6.)  Tuohy closed by criticizing Plaintiff

---

it allows a chemist to determine the molecular structure of
organic molecules."  (Compl. Ex. K at 8.)

for not being "entirely truthful about [FIREClean], the way it works, or what it contains," and misleading consumers into purchasing FIREClean at a high markup under the belief that the "bottle of vegetable oil was the most advanced gun lube on the planet." (*Id.* at 6.)  The same day, Tuohy posted a similarly critical summary of the article on Vuurwapen's Facebook page. (Compl. ¶ 100.)

Six days later, Baker posted a summary of his testing on his Granite State Guns blog under the title "FIREClean vs. Canola Oil."  (Compl. Ex. L [Dkt. 1-12].)  Baker wrote that his testing made him "confident" saying "that the FIREClean I tested is canola oil without the addition of any corrosion inhibitors, stabilizers, or other enhancement materials." (*Id.*)  He closed his article by writing the following:

> I hope I don't make you distrust lubricant companies, but question claims before you blindly believe things.  I spent way too much on Fireclean at one time too.  Don't be mad about it, it still works as lubricant, so use it for that.  And when you go to buy more just know you can get it for less in the cooking section.

(Compl. ¶ 200.)

Plaintiff alleges that Baker and Tuohy conspired to prearrange for Baker's testing to show that FIREClean was indistinguishable from canola oil.  Defendants allegedly entered into this conspiracy in an attempt to injure Fireclean's

8

reputation and product, and to attract more viewers to their blogs.  (Compl. ¶¶ 107, 131-134.)

After the September and October 2015 articles, Tuohy remained engaged in the debate regarding FIREClean by responding to comments on his blog and Facebook page.  In January 2016, Tuohy reposted an article on Facebook that he wrote in 2013 documenting the carbon buildup in an AR-15 rifle after heavy use.  (Compl. Ex. Q [Dkt. 1-17].)  The reposting noted that FIREClean was used on the rifle and that the bolt carrier group of the rifle showed substantial carbon buildup after 5,000 rounds.  (Compl. ¶ 138.)  Tuohy cautioned his readers to "[k]eep this photo in mind the next time you see an image of a dirty AR BCG with '10,000 rounds and no cleaning' that looks much wetter and cleaner than this one.  People lie for the strangest reasons but one of the more common reasons is to separate you from your money." (*Id.*)  Plaintiff interprets that statement to disparage Fireclean and its owners.

In sum, Plaintiff alleges that Baker and Tuohy made defamatory statements in many of the articles and comments discussed above, including (1) Tuohy's September 12, 2015 Infrared Spectroscopy article; (2) Tuohy's article entitled "Where There's Smoke, There's Liars"; (3) Tuohy's October 23, 2015 article summarizing the second round of testing; (4)

9

Tuohy's January 18, 2016 Facebook repost of the 2013 article;
(5) and Baker's October 26, 2015 "FIREClean vs. Canola Oil"
article.  Plaintiff believes those statements falsely or
misleadingly convey that FIREClean is made from a single common
oil that does not have the carbon-reducing properties Plaintiff
claims, FIREClean is not worth the price charged, and Plaintiff
is untrustworthy.

Defendants Tuohy and Baker moved to dismiss the
complaint for lack of personal jurisdiction and failure to state
claims upon which relief can be granted.  (Tuohy Mem. in Supp.
[Dkt. 12-1]; Baker Mem. in Supp. [Dkt. 15].)  In response,
Plaintiff sought leave to conduct limited jurisdictional
discovery.  Magistrate Judge Nachmanoff denied that discovery
motion in a written memorandum opinion and order.  (*See*
Discovery Mem. Op. [Dkt. 34].)  Thereafter, Plaintiff filed its
opposition to the motions to dismiss and timely objected to the
Magistrate's denial of jurisdictional discovery.  The motions
have been fully briefed and argued and are now ripe for
disposition.

## II.       Standard of Review

Federal Rule of Civil Procedure 12(b)(2) permits a
defendant to move to dismiss a complaint for lack of personal
jurisdiction.  Fed. R. Civ. P. 12(b)(2).  Once a defendant

affirmatively raises a personal jurisdiction challenge, the plaintiff bears the burden of demonstrating that personal jurisdiction exists.  *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016).  The plaintiff's burden "varies according to the posture of a case and the evidence that has been presented to the court."  *Id.*  "[W]hen the court addresses the personal jurisdiction question by reviewing only the parties' motion papers, affidavits attached to the motion, supporting legal memoranda, and the allegations in the complaint, a plaintiff need only make a *prima facie* showing of personal jurisdiction to survive the jurisdictional challenge."  *Id.*  When considering whether plaintiff has carried its burden, the court must view all evidence, disputed facts, and reasonable inferences in favor of the plaintiff.  *Id.*; *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003).

### III.      Analysis

A federal court may exercise personal jurisdiction over a defendant in the manner provided by state law.  *Young v. New Haven Advocate*, 315 F.3d 256, 261 (4th Cir. 2002); Fed. R. Civ. P. 4(k)(1)(A).  Courts have consistently construed Virginia to extend jurisdiction to the full extent permitted by the Due Process Clause of the Fourteenth Amendment.  *See Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir.

11

2009); *CFA Inst. v. Inst. of Chartered Fin. Analyst of India*, 551 F.3d 285, 293 (4th Cir. 2009); *Young*, 315 F.3d at 261; *Peninsula Cruise, Inc. v. New River Yacht Sales, Inc.*, 512 S.E.2d 560, 562 (Va. 1999). Accordingly, the personal jurisdiction analysis looks to whether a defendant has sufficient "minimum contacts" with Virginia to satisfy the constitutional due process requirements. *CFA Inst.*, 551 F.3d at 293. Traditionally, courts evaluate a defendant's minimum contacts by considering "(1) the extent to which the defendant 'purposefully avail[ed]' itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'"[8] *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 708, 712 (4th Cir. 2002).

Courts, including the Fourth Circuit, have altered the traditional analysis slightly to account for technological advances that have facilitated the exchange of products and ideas. In *ALS Scan*, the Fourth Circuit adopted and adapted the

---

[8]     The Court's analysis is limited to specific jurisdiction because Plaintiff conceded at oral argument that it is not relying on a theory of general jurisdiction. *Cf. CFA Inst.*, 551 F.3d at 292 n.15 (foregoing general jurisdiction analysis where plaintiff "does not contend that [defendant] was subject to general personal jurisdiction in Virginia").

*Zippo* test, which identified as a guiding principle in Internet-contact cases that "the likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet." *Id.* at 713 (quoting *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D Pa. 1997)). Following that logic, the Fourth Circuit developed the following standard:

> [A] State may, consistent with due process, exercise judicial power over a person outside of the State when that person (1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) the activity creates, in a person within the State, a potential cause of action cognizable in the State's courts.

*ALS Scan*, 293 F.3d at 714.  The Fourth Circuit's standard modifies the *Zippo* test slightly by focusing on the defendant's "*purposeful* targeting of a particular forum, not just the level of interactivity" of the website at issue.  *Graduate Mgmt. Admission Council v. Raju*, 241 F. Supp. 2d. 589, 594 (E.D. Va. 2003); *Bright Imperial Ltd. v. RT MediaSolutions, S.R.O.*, No. 1:11-cv-935, 2012 WL 1831536, at *4 (E.D. Va. May 18, 2012) (accord).  The *ALS Scan* approach reconciles the increased interconnectivity of the Internet Age with the maxim that "technology cannot eviscerate the constitutional limits on a

State's power to exercise jurisdiction over a defendant." *ALS Scan*, 293 F.3d at 711.

The Fourth Circuit provided particularly relevant guidance on the application of the *ALS Scan* standard in *Young v. New Haven Advocate*, 315 F.3d 256 (4th Cir. 2002). There, two Connecticut newspapers and their staff allegedly defamed a Virginia prison warden by posting articles online discussing Connecticut's policy of housing prisoners in Virginia facilities. The Fourth Circuit noted that the place where the Virginia warden would feel the effects of the libelous statements was relevant to the jurisdictional analysis, but the court "emphasized how important it is . . . to look at whether the defendant has expressly aimed or directed its conduct toward the forum state." *Id.* at 263. Thus, the Fourth Circuit combined the first two parts of the *ALS Scan* test to determine "whether the newspapers manifested an intent to direct their website content—which included articles discussing conditions in a Virginia prison—to a Virginia audience." *Id.* The newspapers' websites did not demonstrate that intent, because each website focused on local Connecticut content, even though one newspaper had several Virginia subscribers. *Id.* at 260, 263. The articles themselves also did not indicate an intent to target Virginia readers because the articles' focus was Connecticut's

14

policy of transferring prisoners to Virginia.  The court reached that conclusion even though reporters interviewed a Virginia official when researching the articles, the articles discuss conditions at a Virginia prison, and the articles explicitly name a Virginia prison warden.

As shown below, the present case is materially indistinguishable from *Young* and requires the same resolution.

A.      Defendant Tuohy Has Not Purposefully Availed Himself
        of Virginia

With the principles discussed above in mind, the Court turns to Plaintiff's arguments that specific personal jurisdiction is proper in Virginia over Defendant Tuohy.  The Court will consider each of Plaintiff's arguments in turn.

Plaintiff's claims are based on allegedly defamatory statements Tuohy made on his blog and on Facebook.  Plaintiff identifies the following contacts between Tuohy and Virginia related to those claims: Tuohy exchanged "numerous emails, text messages, Facebook messages, and occasionally phone calls" with Ed Sugg in Virginia regarding the firearm industry and FIREClean between 2012 and 2015; Plaintiff sent samples of FIREClean from Virginia to Touhy in Arizona in 2012 and 2015 to be used in

product testing; and Tuohy exchanged "several"[9] emails, phone calls, or Facebook messages with Ed Sugg in August and September 2015 while Tuohy prepared the Infrared Spectroscopy article. Additionally, Plaintiff notes that at least 90 of the 9,181 people who "like" the Vuurwapen Facebook page live in Virginia, some of Tuohy's readers may have arranged to receive emails when Tuohy posts a blog article or Facebook comment, and some Virginia servers may have processed Tuohy's online content. Plaintiff also emphasizes that Tuohy aimed his statements at a Virginia company with full awareness that Fireclean would feel the harmful effects of those statements in Virginia.  As described below, the Court finds those contacts insufficient to exercise personal jurisdiction over Defendant Tuohy.

As an initial matter, Tuohy's traditional contacts do not demonstrate that he purposefully availed himself of doing business in Virginia in relation to his allegedly defamatory statements.  Tuohy has no home, office, or property in Virginia. He did not write any of the allegedly defamatory statements in

---

[9]      Plaintiff has identified three communications: (1) an August 29, 2015 Facebook exchange in which Sugg "categorically" denied that FIREClean was Crisco.  (Compl. Ex. B); (2) a phone call on September 11, 2015 (Sugg Decl. Ex. A(1)); and (3) an email on September 11, 2015, in which Sugg declined to comment on FIREClean's formula (Sugg. Decl. Ex. A(2)).  Defendant Tuohy recalls that he exchanged "several emails" with Ed Sugg on September 11, 2015.  (Tuohy Decl. [Dkt. 12-2] ¶ 10.)

Virginia.  Nor did he travel to Virginia to investigate the allegedly defamatory articles and comments.  He has no on-going business in Virginia and has visited the Commonwealth only twice for reasons unrelated to this lawsuit.  His only communications into Virginia when preparing these articles were "several" phone calls, texts, or emails to Ed Sugg regarding FIREClean's formula on August 29, and again on September 11, 2015.  From a due process perspective, those contacts are minimal in quantity. *Cf. Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 280 (4th Cir. 2009) (finding twenty-four emails and four telephone calls between parties did not satisfy due process). Furthermore, the quality of those communications is negligible because they account for only passing references in the September 12, 2015 article and do not form the basis of Plaintiff's defamation claims.  *Cf. Young*, 315 F.3d at 262 (placing little, if any, jurisdictional significance on reporters' "few telephone calls into Virginia to gather some information for the articles"); *see also KMLLC Media, LLC v. Telemetry, Inc.*, No. 1:15-cv-432, 2015 WL 6506308, at *10 (E.D. Va. Oct. 27, 2015) (finding defendant's course of investigation in Virginia leading to a defamatory report did not "create Plaintiff's cause of action in this case").

Plaintiff's reliance on the samples it sent from Virginia to Tuohy in Arizona is also unavailing. The personal jurisdiction analysis focuses on Tuohy's purposeful contacts. But it was Plaintiff, not Tuohy, that unilaterally sent the samples from Virginia. (*See* Tuohy Decl. ¶ 8 (noting Fireclean "solicited [Touhy] directly, and sent [him] samples of FIREClean oil to use as part of a product review").) Thus, those samples do not provide any meaningful evidence that Tuohy targeted Virginia. Furthermore, the origin of the samples does not have any apparent connection to the substance of the allegedly defamatory statements. *See KMLLC Media*, 2015 WL 6506308, at *10 ("[T]he registration of a dummy web-site, one e-mail, one phone call, and a cursory sampling of Plaintiff's services for investigative purposes are not very substantive contacts.").

Plaintiff's contention that servers hosting or transmitting Tuohy's websites may be located in Virginia suffers from the same defect. Tuohy's blog is hosted in Arizona by an Arizona company. (Tuohy Decl. ¶ 6.) To the extent a hosting company transmits Tuohy's online content through servers located in Virginia, those unilateral actions by the hosting companies are not evidence of Tuohy's purposeful targeting of Virginia. *See Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 393 (4th Cir. 2003) ("[W]e have characterized as

18

'de minimis' the level of contact created by the connection
between an out-of-state defendant and a web server located
within the forum."). In sum, Tuohy's traditional contacts with
Virginia are not of the quantity, nature, or quality that give
rise to personal jurisdiction.

    The Court is also not persuaded that Tuohy's websites
or online comments and articles demonstrate he directed
electronic activity into Virginia with the manifested intent to
engage in interactions in Virginia.[10] Turning first to the
Vuurwapen Blog and accompanying Facebook page, Plaintiff
identifies nothing to indicate those websites are specifically
directed to Virginia readers. All relevant exhibits and
allegations indicate the websites aim to distribute Tuohy's
opinions to the nationwide marketplace of consumers of firearms
and associated equipment.[11] The fact that at least ninety of the
nine thousand people who have "liked" Vuurwapen's Facebook page
live in Virginia is not to the contrary. It appears completely

---

[10]    The Court will follow the Fourth Circuit's lead in
*Young* and combine the first two elements of the *ALS Scan* test
within this analysis. *See Young*, 315 F.3d at 263 ("When the
Internet activity is, as here, the posting of news articles on a
website, the *ALS Scan* test works more smoothly when parts one
and two of the test are considered together.").
[11]    In addition to distributing his opinion, Tuohy
conducted very limited commercial activity through the Vuurwapen
blog by selling 38 promotional shirts for a gross profit of
$400. (Def. Tuohy's Mem. in Opp'n Discovery [Dkt. 25] at 7
n.2.) Only one shirt was shipped to a Virginia address. (*Id.*)

"random, fortuitous, or attenuated" that roughly one percent of

Tuohy's readers reside in Virginia.  Contacts of that kind do

not indicate purposeful targeting of a Virginia audience.[12]  *See*

---

[12]      This Court is not alone in placing minimal emphasis on
readers' ability to "like" or comment on a Facebook or blog
posting.  *See Bittman v. Fox*, No. 14 C 08191, 2016 WL 2851566,
at *7 (N.D. Ill. May 16, 2016) ("Particularly with respect to a
publication . . . with a substantial national readership,
posting a comment to an online article seems several steps
removed from deliberate[ly] targeting tortious communications
toward an audience in a particular state."); *Binion v. O'Neal*,
95 F. Supp. 3d 1055, 1060 (E.D. Mich. Apr. 2, 2015) ("[P]osts on
Instagram and Twitter were little more than the posting of
information on social media websites, which became accessible to
users in Michigan and elsewhere."); *Thomas v. Barrett*, No. 1:12-
cv-00074, 2012 WL 2952188, at *4 (W.D. Mich. July 19, 2012)
("The opportunity to comment on, 'like,' or 'share' Facebook
posts does very little to move Defendants' page farther up the
continuum from passive to interactive. . . . [T]he Facebook page
'does little more than make information available,' and
qualifies as a passive site."); *Sweetgreen, Inc. v. Sweet Leaf,
Inc.*, 882 F. Supp. 2d 1, 5 (D.D.C. Mar. 23, 2012)
("[Defendants'] Facebook pages and Twitter accounts, while
interactive, are more like a broad national advertising campaign
than a website engaging in e-commerce."); *Sportschannel New
England Ltd. P'Ship v. Fancaster, Inc.*, No. 09-cv-11884, 2010 WL
3895177, at *6 (D. Mass. Oct. 1, 2010) ("If virtually every
website is now interactive in some measure, it cannot be that
every website subjects itself to litigation in any forum—unless
Congress dictates otherwise.  Interactivity alone cannot be the
linchpin for personal jurisdiction.").  *See also ALS Scan*, 293
F.3d at 712 (rejecting principle that "a person's act of placing
information on the Internet subjects that person to personal
jurisdiction in each State in which the information is
accessed"); *GTE New Media Servs., Inc. v. BellSouth Corp.*, 199
F.3d 1343, 1349 (D.C. Cir. 2000) ("[P]ersonal jurisdiction
surely cannot be based solely on the ability of District
residents to access defendants' websites, for this does not by
itself show any persistent course of conduct by the defendants
in the District.").

*Walden v. Fiore*, 134 S. Ct. 1115, 1123 (2014) (noting random contacts insufficient).

The articles and comments at issue also fail to demonstrate an attempt to attract a Virginia audience. Tuohy's articles and comments never reference Virginia and do not focus on FIREClean's Virginia origin or affiliations. Instead, the articles and comments plainly focus on FIREClean's chemical composition, recommended uses for FIREClean, and product testing performed outside Virginia. Those topics were addressed to a nationwide audience of firearms enthusiasts and had no special appeal for Virginia readers. The mere fact that Tuohy referenced a Virginia company, its product, and its owners without mentioning Virginia does not demonstrate an intent to target Virginia, as even overt references to a State may be jurisdictionally insufficient if the focus of the article is elsewhere. *See Young*, 315 F.3d at 263-64 (noting articles referenced Virginia warden by name and Virginia prison conditions).

Finally, Plaintiff argues it felt the effects of Tuohy's comments and suffered reputational harm in Virginia, where Fireclean is headquartered. Plaintiff casts this argument in the mold of *Calder v. Jones*, 465 U.S. 783 (1984), where the Supreme Court found jurisdiction in California over Florida

21

residents who authored a newspaper article with California as
"the focal point both of the story and of the harm suffered" by
the California actress that was the subject of the story.  *Id.*
at 789.  Since *Calder*, however, the Supreme Court and the Fourth
Circuit have brushed back attempts to vest jurisdiction in a
State based entirely or predominantly on the locus of the
plaintiff's injury.  In *Walden v. Fiore*, 134 S. Ct. 1115 (2014),
for example, the Supreme Court reiterated that "mere injury to a
forum resident is not a sufficient connection to the forum."
*Id.* at 1125.  Instead, the "proper question is not where the
plaintiff experienced a particular injury or effect but whether
the defendant's conduct connects him to the forum in a
meaningful way."  *Id.*  Applying the same distinction in *ESAB
Group Inc. v. Centricut, Inc.*, 126 F.3d 617 (4th Cir. 1997), the
Fourth Circuit rejected the argument that jurisdiction
necessarily vests wherever a plaintiff feels the balance-sheet
injury of decreased sales nationwide.  "Such a theory would
always make jurisdiction appropriate in a plaintiff's home
state, for the plaintiff *always* feels the impact of the harm
there."  *Id.* at 626.  That broad conception of jurisdiction,
however, would unhinge the jurisdictional analysis from the
constitutional focus on the defendant's decision to purposefully
avail itself of the forum state.  *Id.* at 625-26.  Instead of

committing that basic error, the better approach is to recognize that "[a]lthough the place that the plaintiff feels the alleged injury is plainly relevant to the inquiry, it must ultimately be accompanied by the defendant's own contacts with the state if jurisdiction over the defendant is to be upheld." *Id.* at 626. Both those considerations are incorporated into the *ALS Scan* test, as the Fourth Circuit has repeatedly recognized. *See Young*, 315 F.3d at 262-63; *ALS Scan*, 293 F.3d at 714. As described above, applying that test to this case leads persuasively to the conclusion that Tuohy did not purposefully avail himself of Virginia by posting his articles and comments online. Accordingly, the Court must dismiss Defendant Tuohy for lack of personal jurisdiction.[13]

B.        Defendant Baker Has Not Purposefully Availed Himself of Virginia

Plaintiff's only argument in support of exercising personal jurisdiction over Defendant Baker is that Tuohy's

---

[13]        The Court is also not persuaded by Plaintiff's reference to an out-of-circuit precedent that this very Court previously found "inapposite" to a similar personal jurisdiction challenge. *See KMLLC Media, LLC v. Telemetry, Inc.*, No. 1:15-cv-432, 2015 WL 6506308, at *10 n.5 (E.D. Va. Oct. 27, 2015) (distinguishing *Alahverdian v. Nemelka*, No. 3:15-cv-060, 2015 WL 5004886 (S.D. Ohio Aug. 24, 2015)). Unlike in this case, the emails in *Alahverdian* substantially targeted the forum state by impersonating the forum-state plaintiff, citing a forum-state news source, and referencing the plaintiff's connection to the forum-state. *Alahverdian*, 2015 WL 5004886, at *5.

contacts with Virginia apply to Baker because the two were co-conspirators.[14]   To succeed on this conspiracy theory of jurisdiction, Plaintiff must "make a plausible claim" that (1) a conspiracy existed; (2) the Defendants participated in the conspiracy; and (3) "a coconspirator's activities in furtherance of the conspiracy had sufficient contacts with Virginia to subject that conspirator to jurisdiction in Virginia."  *Unspam Tech., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013).  A plaintiff cannot satisfy those elements with "bare allegations." *Id.* (quoting *Lolavar v. De Santibanes*, 430 F.3d 221, 229 (4th Cir. 2005)).  Plaintiff fails to satisfy the first and third elements in its conspiracy-jurisdiction theory.

The third element requires that at least one conspirator's activities in furtherance of the conspiracy would subject that conspirator to personal jurisdiction in Virginia. Here, Plaintiff relies on Defendant Tuohy's contacts.  As described above, however, Defendant Tuohy's contacts with Virginia are not sufficient to subject him to personal jurisdiction in Virginia.  Accordingly, imputing those contacts to Defendant Baker does not create personal jurisdiction over Baker in Virginia.

---

[14]     At oral argument, Plaintiff conceded that it was not attempting to assert jurisdiction over Baker based on Baker's own contacts with Virginia.

Furthermore, Plaintiff has not adequately pleaded that any conspiracy existed between Tuohy and Baker. The "essence" of a conspiracy claim is that defendants "combined together to effect a preconceived plan and unity of design and purpose." *Bay Tobacco, LLC v. Bell Quality Tobacco Prods., LLC*, 261 F. Supp. 2d 483, 499 (E.D. Va. 2003) (internal quotation omitted). Bare allegations, facts amounting to only a "logical possibility," *Unspam Tech., Inc.*, 716 F.3d at 330, or a theory of conspiracy that is "based on inferences that are not fairly and justly drawn from the facts alleged," *Bowman v. State Bank of Keysville*, 331 S.E.2d 797, 802 (Va. 1985), are not sufficient. Plaintiff's conspiracy allegations do not satisfy the plausibility pleading requirement. Plaintiff's theory is that Baker and Tuohy conspired to publish a test that would show FIREClean is the same as Crisco or canola oil, even though they knew the test was inadequate to reach that conclusion, so as to attract more viewers to their blogs. Although such a conspiracy is logically possible, it is not plausible based on the facts in this record. The foundation of Plaintiff's theory is that a critical review of FIREClean would attract more readers to the blogs. Criticisms of FIREClean being Crisco, however, were already commonplace online due to earlier published statements

25

in the Vuurwapen blog, the Firearm blog,[15] and George Fennell's publications, among others.  The Court finds no reason to conclude that an article affirming the prior tests would attract more readers than results disputing the prior test results. Furthermore, the record is replete with facts providing non-conspiratorial explanations for why Baker chose the Infrared Spectroscopy and NMR Spectroscopy to analyze FIREClean, including the advice of his professors, his personal research on the best testing methods, his available equipment, and the methods that two individuals with doctorates in chemistry used to test FIREClean.[16]  In sum, it does not plausibly or fairly follow from the facts alleged that Baker and Tuohy had a preconceived plan to conduct a fraudulent test so as attract more readers to their blogs by declaring FIREclean to be Crisco. Accordingly, the lack of conspiracy provides an additional basis for not imputing Tuohy's contacts onto Baker for jurisdictional purposes.

         For the foregoing reasons, the Court must dismiss the claims against Defendant Baker for lack of personal jurisdiction.

_____

[15]     The Firearm Blog reported on Tuohy's Spectroscopy Article on September 13, 2015. (Compl. ¶ 90.)
[16]     It is also noteworthy that Defendant Baker has never received any income from his blog.  (*See* Baker Affidavit [Dkt. 42-1] ¶ 8.)

C.        Plaintiff's Objection to the Magistrate Judge's Denial
          of Jurisdictional Discovery is Overruled

          Prior to the hearing on these motions to dismiss,

Magistrate Judge Nachmanoff issued a thorough opinion denying

Plaintiff's motion for jurisdictional discovery.  (*See* Discovery

Mem. Op. [Dkt. 34].)  Plaintiff timely raised two objections to

that memorandum opinion and order.  (*See* Objection [Dkt. 39].)

Because a jurisdictional discovery ruling is not dispositive,

the Court reviews the Magistrate's order to determine whether it

is "clearly erroneous or is contrary to law."  *See* Fed. R. Civ.

P. 72(a); *Mamo v. BP P.L.C.*, No. 1:05-cv-1323, 2006 WL 897217

(E.D. Va. 2006) (reviewing jurisdictional discovery order under

Fed. R. Civ. P. 72(a) standard); *Jesselson v. Outlet Assocs. of*

*Williamsburg, Ltd. P'ship*, 784 F. Supp. 1223, 1228 (E.D. Va.

1991) (same).  A court's "finding is 'clearly erroneous' when

although there is evidence to support it, the reviewing court on

the entire evidence is left with the definite and firm

conviction that a mistake has been committed."  *United States v.*

*U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948); *see also Harmon v.*

*Levin*, 772 F.2d 1150, 1152 (4th Cir. 1985).  The Court finds no

basis for setting aside the Magistrate's denial of discovery

under the above standard.

          Plaintiff's first objection is that the Magistrate

improperly conducted only a general jurisdiction analysis while

27

foregoing a specific jurisdiction analysis.  Plaintiff contends that this error is most pronounced in the opinion's discussion of discovery into the citizenship of Tuohy's readers. (Objection ¶ 3.)  Contrary to Plaintiff's argument, the Magistrate's opinion accurately stated the standard for specific jurisdiction and applied that standard to each of Plaintiff's discovery requests in twelve pages of analysis.  The opinion described why discovery into the citizenship of Tuohy's readers would, at best, show that some Virginia citizens unilaterally elected to follow, subscribe, or "like" Tuohy's blog or Facebook page.  The Magistrate reasonably concluded that such unilateral contacts would not demonstrate Tuohy's purposeful targeting of Virginia and those contacts would not give rise to Plaintiff's claims.  (*See* Discovery Mem. Op. at 16-18 (quoting *Intercarrier Commc'ns, LLC v. KIK Interactive, Inc.*, No. 3:12-cv-711, 2013 WL 4061259, at *4 (E.D. Va. Aug. 9, 2013)).  The Court does not find that assessment clearly erroneous or contrary to specific-jurisdiction principles.

As a second objection, Plaintiff contends that the Magistrate misinterpreted this Court's opinion in *KMLLC Media, LLC v. Telemetry, Inc.*, No. 1:15-cv-432, 2015 WL 6506308 (E.D. Va. Oct. 27, 2015), leading to the erroneous denial of discovery into Plaintiff's own communications with Defendant Tuohy

regarding Tuohy's articles and comments. The Magistrate denied discovery into those contacts as "irrelevant for purposes of specific personal jurisdiction." (Discovery Mem. Op. at 8, 15-16.) Although that statement goes further than this Court's characterization of similar contacts in *KMLLC* as "not very substantive" and entitled to "little weight," 2015 WL 6506308, at *10, the Magistrate's denial of discovery into those contacts was nonetheless correct. Plaintiff failed to make more than conclusory allegations that additional relevant communications between Plaintiff's owners and Tuohy exist. Plaintiff also failed to articulate how such communications could aid the resolution of the jurisdictional issues when the articles plainly reveal that Tuohy's communications with Plaintiff had marginal, if any, impact on the allegedly defamatory nature of Tuohy's statements. Accordingly, the Court will overrule the objections to the Magistrate's denial of discovery. *See Carefirst*, 334 F.3d at 402-03 (denying discovery when plaintiff "offers only speculation or conclusory assertions about contacts with a forum state"); *ALS Scan*, 293 F.3d 716 n.3 (denying discovery request that "would not aid resolution of the personal jurisdiction issue").

**IV.        Conclusion**

For the foregoing reasons, the Court will grant the motions to dismiss for lack of personal jurisdiction and will dismiss this case without prejudice.

An appropriate order will issue.

/s/

| | |
|---|---|
| July 21, 2016 | James C. Cacheris |
| Alexandria, Virginia | UNITED STATES DISTRICT COURT JUDGE |